## STEPHENS et al. v. UNITED STATES.
### No. 5775.

Circuit Court of Appeals, Ninth Circuit.
June 2, 1930.

Raymond Benjamin, of San Francisco, Cal., and Otto Christensen, of Los Angeles, Cal., for appellant Stephens.

Benjamin F. Bledsoe, of Los Angeles, Cal., for appellant Wells.

Wright & McKee and C. M. Monroe, all of San Diego, Cal., David H. Cannon, of Los Angeles, Cal., and Morrison, Hohfeld, Foerster, Shuman & Clark, of San Francisco, Cal., for other appellants.

Before DIETRICH and WILBUR, Circuit Judges, and NETERER, District Judge.

DIETRICH, Circuit Judge.

The six appellants, Stephens, Spicer, Wotkyns, Hallawell, Wells, and Steward, were convicted upon all counts but one in an indictment returned May 24, 1928, charging them on each of the first seventeen counts with using the mails to defraud (Cr. Code, § 215, 18 USCA § 338), and in the eighteenth count with a conspiracy to commit such offenses. On motion of the district attorney the seventh count was dismissed and reference hereinafter made to the first seventeen counts will be understood as excluding this one. The charges all have to do with the transactions of inter-related partnerships and corporations of which appellants were officers or agents. The period covered thereby was from about January 1, 1919, to the latter part of December, 1926, at about which latter date the concerns became bankrupt. Generally speaking, they were engaged in California in purchasing issues of corporate stocks and bonds and selling such securities in small lots to the public. Essentially the fraud charged consisted in false representations made to the public in respect of these securities, and also touching sales of the stock of the corporations themselves and in the use by the defendants of the funds of the corporations.

Very briefly but adequately for present purposes, the defendants in their brief have

summarized the features of the alleged scheme to defraud as set forth in the first 17 counts of the indictment, as follows:

"(A) Failure by the defendants to deliver and intent of the defendants to take the money of the investors and never to deliver any securities whatever, as set out in paragraphs (1), (8), (9) and (10), and failure to return securities deposited as collateral, as set out in paragraph (5) supra.

"(B) Delivery by the defendants of securities, bonds, stocks and interim receipts of no value whatever, as set out in paragraphs (2), (3) and (4), supra.

"(C) Promises to purchase stock of Stephens & Company, from the investors and failure of both the defendants and the corporations to ever repurchase any of said stocks, as set out in paragraphs (6) and (11), supra.

"(D) Circulation of false financial statements and payments of dividends not from net earnings but from capital and false statements as to the earnings and profits; and that the investment in the stock of the corporation was a safe and profitable one, as set out in paragraph (12), supra.

"(E) Conversion of more than $200,-000.00 by the defendants, the said defendants making no return or payment whatever therefor to the said corporations, as set out in paragraph (1), supra.

"(F) The false representations as to the value of the stock of Stephens & Company inasmuch as the stock was of little or no value, as set out in paragraph (13), supra.

"(G) The use of money and property of the said corporation (causing such assets to be diminished and depreciated) for the financing of the defendants' own private dealings, as set out in paragraph (14), supra."

The business originated with appellant Stephens, who soon thereafter associated with him the appellant Spicer, under the name of Stephens & Company. This was in 1909. In 1911, the business was incorporated under the name of Stephens & Company, with a capital stock of 250 shares of the par value of $100 each. As the business grew the capital stock was increased from time to time, in 1914 to $100,000, in 1919 to $1,000,000, with both common and preferred stock, and in 1922 to $2,000,000. Up to 1919 the stock was all owned by Stephens and Spicer. The company had an extensive organization covering the state of California, with offices in San Diego, Los Angeles, and San Francisco, and branch offices at Oakland and Pasadena.

It had correspondents in eastern and European money centers, with private wire connections to New York, and held seats on the stock exchanges in Los Angeles and San Francisco. Because of certain restrictions of these exchanges, in 1917 a partnership was formed between Stephens and Spicer for the purpose of handling the brokerage branch of the business. About 1919 another corporation was formed, known as the "Public Lien & Realty Company," to which, under a permit from the corporation commissioner of the state, the assets of Stephens & Company were transferred, subject to all its debts and liabilities, in exchange for all the authorized capital stock of the transferee. It is to be inferred that the properties so transferred were, in the main, what are called "frozen assets." This course was pursued, so it is contended by appellants, to enable Stephens & Company to carry on its brokerage and investment banking business with greater facility and unhampered by these nonliquid assets.

In the latter part of 1922, or early in 1923, a new corporation was organized called Stephens *and* Company, under a recently enacted law of California permitting the organization of corporations with stock of no par value. It is the contention of appellants that the old company found itself in need of more capital to carry on its increasing business, and the purpose was to transfer all of the property and business interests of the old company to the new, and to acquire additional capital by selling the stock of the latter. However, efforts to have all of the stockholders of the old company exchange their stock for that of the new company were unsuccessful and, for that reason, the corporation commissioner would not permit the transfer of all of the assets of the old company to the new. The two, therefore, continued to do business until they collapsed and became bankrupt in December, 1926. In the record these companies are referred to as No. 1 and No. 2 and, during the life of the latter, they were apparently operated virtually as a single corporation, with the same personnel, but the old company, No. 1, was the more active, and in its name practically all of the business was transacted. In volume the business grew from $750,000 in 1911 to $22,000,000 in 1922, and the average volume during the period covered by the indictment was between $18,000,000 and $20,000,000 each year.

The transactions covered by the evidence did not, strictly speaking, constitute broker-

age business; that is, the company did not act as a mere agent in the purchase and sale of stocks for its clients. Its general course of business was to purchase the whole or a large part of an issue of corporation stocks or bonds and then, through its agents, make sales of small parcels thereof to the investing public. Instead of delivering the stock or bonds thus sold to a purchaser, it accepted the purchase price and issued what is referred to as an "Interim Receipt," entitling the purchaser to the delivery of the specific stocks or bonds described therein. In many cases these interim receipts were never honored, the aggregate amount thereof outstanding at the time of the bankruptcy proceedings being approximately $400,000; but upon receiving the purchase price it was by the company deposited to its credit and used in carrying on its business. It would seem from the testimony that at one time or another during the period covered by the indictment the company acquired title to the securities so sold, sufficient in kind and quantity to make the deliveries called for by these receipts, but, as at least one of the reasons why it did not make delivery, the appellants contend that in carrying on its business and in taking over large issues of such bonds and stocks, it became necessary to borrow funds from banks and in doing so it deposited such securities in block with the banks as collateral, with the result that it lost control of them and deliveries thereof could not immediately be made. As charged in the indictment and as is contended by the government, one element of the alleged fraudulent scheme was that the company would thus sell securities with knowledge that it could not make, and had no intention of making, delivery to the purchaser.

During all, or a part, of the period covered by the indictment, Stephens, Spicer, Wotkyns, and Hallawell were officers of the company. Stephens, president of the company, was the manager at San Francisco, where the administrative offices and the "control books" of the business were maintained. Spicer, a vice president, continued in charge of the original offices at San Diego. Wotkyns, also a vice president, was manager of the Los Angeles office. Hallawell, beginning as a bookkeeper in 1919, became the secretary in December, 1924. Steward began to work for the company in 1922 and later became manager of the branch office in Oakland. Wells began as a salesman in 1922 and later became manager of the branch office in Pasadena.

The transcript of the record is very voluminous and the briefs are of unusual length, many questions being discussed; and the problem of adequate treatment within the reasonable compass of an opinion is attended with great difficulty. The brevity of our comment on any particular specification must therefore not be taken as indicative of inadequacy of consideration.

█ In both form and substance the indictment and the several counts thereof are thought to be sufficient. The principal contention under this head relates to the conspiracy charge and particularly the averment of the overt acts. As is the common practice, after a description of the conspiracy, this count sets forth that "in pursuance of * * * and for the purpose of carrying out and to effect the object, design and purposes of said conspiracy * * * the hereinafter named defendants did commit the following overt acts." Thereupon the overt acts are particularly specified and described. The point urged is that in addition to such an allegation the indictment upon its face must show in what manner or how the alleged overt acts contributed to the furtherance of the conspiracy. We think the rule is well settled to the contrary.

█ No assignment is based upon instructions given or requests refused, and it must therefore be presumed that the charge to the jury was adequate and correct.

█ It may be well first to dispose of a preliminary question discussed at some length, particularly in appellants' reply brief. It is their position that no relation of trust arose between the company and purchasers from or through it and that the acceptance of a purchaser's money and the appropriation thereof to the company's own use without delivering the securities for which the payment was made did not constitute embezzlement; in short, that the company was not acting in the capacity of a brokerage agent but was rather a vendor of securities, and that therefore no fiduciary relation existed but only that of debtor and creditor, with the obligation on the company's part either to deliver the stock specified in the Interim Receipt as having been purchased or pay back the money. We need not decide the precise question, for under the indictment and evidence it is not of controlling importance. The charge is not of embezzlement but of using the mails to promote a scheme to defraud. If, in pursuance of a plan, the company sent out its agent to represent, and he did represent, to Jane Smith that it had for sale a certain security

of a stated value and thus induced her to purchase the same and to pay the price therefor, with the understanding that delivery would be made within a stated time, when it knew that because it did not own the security or because of its hypothecation it had put it beyond its control, it could not make such delivery and did not make it, but, nevertheless, devoted the money so paid to its own purposes and used the mails in furtherance of the transaction, an offense under the statute and the indictment was committed whether or not we characterize such use of the money as embezzlement. The conduct would constitute a fraud, having all the moral obliquity of, even though not constituting, embezzlement in a technical sense. It is quite inconceivable that any sensible, small investor, with a clear understanding that the company's obligation would be only such as appellants now assert, would have delivered his money to its agents.

■ We find no merit in the contention that inasmuch as by the indictment it is charged, in effect, that it was defendants' intention to defraud *all* who dealt with the company and that *no* securities were to be delivered to any of the purchasers, the evidence is insufficient because it tends to show only that some purchasers were so treated. The scheme or artifice proved is not so broad but is included within the charge and is identified therewith. It is not a case of alleging one offense and proving another entirely distinct therefrom. True, all the essential elements of the offense as it is defined by the statute must be established, but that is not to say that proofs showing one of the elements to be smaller or less flagrant than as alleged, fail to meet the requirement. One charged with a theft of $1,000 cannot escape conviction merely because the evidence discloses that the amount was only $900. Sasser et al. v. United States (C. C. A.) 29 F.(2d) 76.

■ Several of the contentions urged relate to the books and records of Stephens & Company and its allied concerns and the testimony of the expert accountants, Huling and Bryan. The prosecution had in some manner acquired possession of these books of account and records, approximately 250 volumes, and for convenience kept them in two rooms in the building where the trial was had. Former auditors and bookkeepers of the companies, after examining them and initialing them, testified that they were the books and records of the companies and all such books and records of which they had any knowledge. Huling and Bryan each testified

that he had examined all the books and records of the company, and certain testimony they gave in the nature of data and computations was based thereon or deduced therefrom. Before such testimony was given, as appears from a colloquy in open court, it was in substance agreed that because the records were so voluminous they need not preliminarily be brought into the courtroom, that they should continue to be held in the rooms referred to, accessible to all parties, that if required the witness should in giving his testimony specify the volume relied upon, and that if, at any time, any book was desired, it would be brought into the courtroom. No one of the books was offered in evidence by any party, but toward the close of the government's case, at its request and with defendants' acquiescence, all the volumes so referred to as being in the two rooms were by the clerk marked for identification. It was not incumbent upon the prosecution to introduce the books in evidence. Such requirement would be fundamentally inconsistent with the reasons underlying the rule that qualified accountants may testify to computations, deductions, or summaries where the material facts to be shown can be ascertained only by the inspection of a large number of documents or the analysis of complicated accounts. Ordinarily the party offering such testimony should be required to produce in court or to make available for his opponent's use the documents and books used by the witness, but even that rule is not universally followed and where recognized it is subject to exceptions. Wigmore on Evidence (2d Ed.) § 1230; Burton v. Driggs, 20 Wall. (87 U. S.) 125, 22 L. Ed. 299.

Perhaps the point most seriously urged in this connection is that there is no testimony that the books stored in the two rooms and so identified by former employees of the companies were the identical books inspected by these two witnesses and used as the basis for their computations and deductions. It seems to be true that there is no express or direct testimony of that character. But as we construe the objections interposed they do not evince any intention on the part of defendants to raise such a question. Both on direct and cross examination it was apparently assumed that the witnesses were referring to the books stored in the two rooms and identified by former employees; and an inference of such identity would not be unwarranted.

■ Another contention in this group relates more particularly to the testimony of the witness Bryan. Referring to what appear to be

annual financial statements of Stephens & Company, he criticized them as not reflecting the true financial condition of the company as of the dates to which they relate. One of the criticisms was that they exhibited as assets, stocks or bonds which, as he contended the record showed, had either not been issued or of which the company had not acquired possession and ownership during the periods covered by the statements. Clearly, we think the objections made to this part of the testimony are without merit. The other criticism was that some of the statements exhibited items of stocks or bonds as assets at highly excessive overvaluations. In reaching his conclusion as to what would have been a reasonable valuation he frankly stated that he resorted to information not appearing in the books and records of the company. But it appears that he was not only a trained accountant in the strict sense, but that he had had long and wide experience in connection with business where it was necessary to observe and place valuations upon such securities, and, as he put it, he followed the same course in this case in resorting to sources of information touching value "as I have done all my life in valuing securities." While the propriety of receiving his testimony in this respect is not entirely free from doubt, we are of the view that the court did not abuse its discretion in admitting it, and that there was no prejudicial error.

Specific comment upon other objections referred to in the briefs as a part of this group is not thought to be necessary. Upon consideration we find them less debatable than those we have discussed.

■ The question whether there was a scheme, artifice, or conspiracy to defraud within the scope of the charges laid in the indictment was properly one for the jury. True, the evidence does not show that the defendants got together and expressly agreed upon a plan, the sole purpose of which was to deceive. And it may also be conceded that in their framework the organizations set up and operated by defendants were ostensibly legitimate and, in their original purpose, at least, some of them may have been intended only for the conduct of a lawful business in a lawful manner. But a business lawful in form and appearance does not escape the denunciation of the criminal statutes when it is commonly furthered by the use of deception and fraudulent practices. That in case of exigency, real or supposed, or when it was thought to be to their interest, the defendants were willing to resort to false statements or concealment of facts, the record scarcely leaves room for doubt. In one instance at least there was an expressed contempt for bankers and the rules of honest finance but, aside from that consideration, so frequently were securities shifted, statements manipulated and padded, "Dummy" assets set up, their own private interests furthered to the prejudice of the corporate business, and other irregular practices indulged, that the finding of a plan or scheme to which all the defendants assented and in which to some measure they all participated, to carry on the business by deceiving both the investing public and bankers would be fully warranted. To refer to a single phase of their activities: At times they had outstanding "Interim Receipts" for the purchase price of specific securities aggregating in excess of $1,000,000. Naturally many of the holders of these receipts were clamorous for the delivery of their securities for which they had paid and which, admittedly, they were entitled to receive. Not having the funds with which to complete the purchase of the securities requisite for that purpose or to redeem them from the banks holding them as collateral, defendants themselves, or through subordinate agents, went out and made new "sales" to other investors and, receiving the purchase price on account thereof, with the promise express or implied of prompt delivery, used the funds thus realized not for the purpose of fulfilling such promises but of quieting the clamor of the older investors by procuring and delivering to them their securities. Whatever the exigencies of the defendants' business, such a course was flagrantly fraudulent. Would it be seriously contended that if given any intimation that such was the condition of the company and that such use was to be made of his money, any sensible investor would have turned it over and been content with a mere receipt? Indeed, it is quite improbable that at any time during a period of several years preceding the utter collapse of the business in the latter part of 1926, would it have been possible for defendants upon a complete and truthful disclosure of the financial condition of their companies to have sold to investors, large or small, any considerable amount of stock in their companies, or other stocks or bonds in which they dealt, except upon simultaneous delivery of the latter. Under the conditions actually existing it was unlikely that sales of either class could be effected without deception, accomplished either by affirmative representations, concealment, or promises known to be impossible of fulfillment or not intended to be kept.

In what we have said under this head we are not to be understood as necessarily holding that the evidence is sufficient to establish the scheme in all of the ramifications alleged. For example, as charged it contemplated, among other wrongs, the misappropriation by defendants and the conversion to their own use of funds and assets of the company approximating $200,000. This is a distinct feature, having no direct or necessary relation to that part of the scheme covering the sales of securities by false representations and other deceptive practices. Obviously, we think, a conviction might have been sustained if no evidence at all had been offered in support of this specific branch of the case. Evidence there was upon the point, but whether or not it would be sufficient to support a conviction in the absence of evidence upon the other, more general, phases of the alleged scheme we have not fully considered, for whatever the answer it would not affect the result. Sasser et al. v. United States (C. C. A.) 29 F.(2d) 76.

Grouped together in the briefs are certain alleged errors respecting the reception in evidence of what are referred to as "interoffice memoranda," that is, letters, memoranda, and other writings passing from one officer or employee to another in the regular course of business. Appellants assert that there were more than five hundred pieces altogether offered in evidence in connection with the testimony of former office employees who, at least to some extent, identified them. To many of them no objection was interposed, and where objections were made, apparently little care was taken to discriminate between cases where rejection of the offer would clearly have been erroneous and other cases where the question was debatable. With the statement that it would be impracticable to assign error as to each, appellants specify and argue only six, namely, Nos. 338, 381, 383, 386, 390, and 478. Presumably these afford bases for objections quite as substantial as any others that might be specified.

The witness Stowell, for a long period acting as auditor and in other capacities in the office of the company, identified No. 338 as a carbon copy of a letter he wrote and sent. It bears date March 3, 1922, and is addressed RDS. (copy GCS.) From Stowell's testimony as a whole touching office usage and his specific explanation of this paper, it was clearly a fair conclusion that the original was sent to defendant Spicer and a copy to defendant Stephens, and the objection is thought to be devoid of merit.

Exhibits Nos. 381, 383, and 386 are all in approximately the same posture. Each consists of a group of letters which the prosecution contended were written by and to defendant Stephens. The district attorney, without challenge from the defendants, stated in open court that these papers, together with the others referred to under this head, had been delivered to his office by the trustee in bankruptcy from the files of Stephens & Company, whose estate was in the course of bankruptcy administration. A witness who for about six years, including the dates of the several documents embraced in these exhibits, was Stephens' private secretary, though testifying with apparent reluctance, sufficiently identified the papers. This she did by reference to initials customarily used, form, structure, and phraseology, with all of which she was familiar. No error was committed in receiving them.

Exhibit No. 478, dated June 16, 1924, the government contended was a copy of a letter written by defendant Spicer. Margaret K. Prindegast testified that during the years 1924, 1925, and 1926, she was Spicer's secretary and took dictation from him. She was unable to say whether this particular letter was so dictated, but she identified her initials shown thereon and those of Spicer, and she further stated that she knew of no other person using such initials. We think a prima facie case of identification was made out.

No. 390, which the government contends is a copy of a letter written by defendant Steward, manager of the local office, was in substantially the same manner and to the same extent identified by a witness who for a long period acted as his secretary.

As to the group of letters covered by No. 386, it is further contended that the court permitted them to be read to the jury though they had not been formally introduced in evidence. In the trial the course pursued was often to identify and introduce many exhibits in succession without at once reading them to the jury. When, some time after No. 386 was identified, the district attorney started to read it to the jury in connection with other evidence, one of the attorneys for defendant interposed, "That is for identification," to which the District Attorney replied, "It is in evidence." The reading then proceeded without any request for or obtaining a ruling of the court. It may be that the exhibit had not up to that time been formally put in evidence but, as already indicated, it had been sufficiently identified and was thus read in

evidence without further objection or any ruling or exception. That counsel for defendants understood it was put in evidence either at the time it was identified or at this time is shown by the fact that later on they moved to strike it out. We find no error under this head.

Assuming for the time being that a scheme to defraud and a conspiracy were shown, defendants further contend, as to each count, the evidence was insufficient to establish that there was a use of the mails as charged in the first seventeen counts or the commission of the overt acts charged in the eighteenth count, and also, if the mailing and overt acts be admitted, that they were done in furtherance of the scheme or conspiracy. It is of course conceded by the government that to establish the offenses charged both elements or conditions must be shown. The probative value and reach of the direct or positive evidence upon either one of these issues—often very meager—cannot be justly appreciated without knowledge of the very many circumstances, proximate and remote, tending to supplement it and enlarge its scope. These it would be well-nigh impossible to reproduce, and, manifestly, to comment adequately upon each point separately as to every count would extend the opinion beyond a reasonable length. After a somewhat laborious investigation of the record we must therefore be content with the statement of what is little more than our conclusions. Considering the course of the trial and all the circumstances in evidence, we are of the opinion that the question whether there was a use of the mails as alleged was properly for the jury under counts 1, 2, 3, 4, 5, 6, 8, 11, 14, 15, 16, and 17, but that the evidence was, as a matter of law, insufficient under counts 9, 10, 12, and 13. Where, as in such case, the issue turns upon circumstantial evidence, it is difficult to find an exact precedent, but see Stokes v. United States, 157 U. S. 191, 192, 15 S. Ct. 617, 39 L. Ed. 667; Sasser v. United States (C. C. A.) 29 F.(2d) 76; Rasmussen v. United States (C. C. A.) 8 F.(2d) 948; Lewis v. United States (C. C. A.) 38 F.(2d) 406; Krotkiewicz v. United States (C. C. A.) 19 F.(2d) 421; Barnard v. United States (C. C. A.) 16 F.(2d) 451; Levinson v. United States (C. C. A.) 5 F.(2d) 567; Horn v. United States (C. C. A.) 182 F. 721. Though in respect to certain circumstances they are distinguishable, it may be that Freeman v. United States (C. C. A.) 20 F.(2d) 748, Brady v. United States (C. C. A.) 24 F.(2d) 399, and Beck v. United States (C. C. A.) 33 F.(2d) 107—cases much relied upon by defendants—adhere to a more exacting standard of positive or direct proofs, but, if so, we are unable to follow them to the full extent.

▋ In respect of the question whether such use of the mails was in the "execution" of the "scheme" to defraud, defendants' position is, in the main, that the business conducted by them is not shown to have been wholly fraudulent, in all of its branches, and that the mailings were made in the promotion of the lawful features, or at least that the evidence fails to show any connection with those branches which were promoted by deception and false pretenses. But direct connection was not requisite. The business was a single general enterprise, and a lawful activity in the course thereof might very well have made a material contribution to the success of another activity illegitimate in its purpose or fraudulent in the means used in carrying it forward. Where an enterprise contemplates dealings with the public on a large scale for a long period, it would be a short-sighted policy on the part of the promoter to attempt to deceive all, particularly in the earlier stages of the promotion. The fair or generous treatment of one person in a community with attendant publicity might very well serve as bait to attract others and render them more susceptible to fraudulent practices. So, satisfaction of the complaints of a troublesome customer might allay the suspicion of others and postpone or ward off threatened investigation in cases where fraud had been employed. If fraudulent in important and continuing branches of its activities, the enterprise as a whole may properly be characterized as a fraudulent scheme. Brady v. United States (C. C. A.) 26 F.(2d) 400.

Applying these principles we have reached the conclusion that while as to some of the counts, particularly 1, 2, and 11, the evidence is meager, it was sufficient to go to the jury upon the twelve counts in respect of which we have held mailing was shown.

▋ Little need be added touching the eighteenth, or conspiracy, charge. It is generally recognized that when two or more persons engage in a scheme to defraud, to that extent they become coconspirators. We have already held the evidence warrants a finding that such a scheme was formed and that the defendants knowingly participated therein. This scheme undoubtedly contemplated the use of the mails in its execution, and, that being true, it follows that whether or not a conspiracy was entered into to violate section 215 of the Criminal Code (18 USCA § 338), as charged, was for the jury. The only remaining question is whether at least one of the overt acts alleged was in fact committed,

and for the purpose of furthering the object of the conspiracy. That they were all committed is scarcely open to controversy, and we are of the opinion that there was sufficient evidence to take the case to the jury upon the other branch of the question.

By an elaborate argument in the form of a supplementary brief on behalf of appellant Stephens, the contention is made that, all else aside, it is shown that the charges against him were barred by the statute of limitations. Its consideration in connection with the 18th count will suffice. We have already noted that the indictment was returned on May 24, 1928. Stephens' position is that he withdrew from the business in December, 1924, or January, 1925, and thereafter had no interest therein or connection therewith, within the three-year period of limitations. He himself did not give testimony and, while asserting the incompetency of contemporaneous statements of other officers to the effect that his connection continued at least up to about June 15, 1925, he relies largely upon other statements of like status, upon his own self-serving declarations, and upon remote and strained inferences. But we do not find ourselves under the necessity of determining just what change or changes were actually made in his relations to the business in December, 1924, or January, 1925. Undoubtedly during the latter month he left for Europe and, after an absence of about five or six months, returned to San Francisco. The government contends that if he severed his connection at all it was not until after his return; and this view receives strong inferential support from his own conduct. On or about June 15, 1925, he wrote letters of the same form to Wells and Leavitt, both of whom held highly responsible positions with the company and upon its behalf dealt directly with the public. One of these, addressed to Wells, branch manager for the company at Pasadena, is set up as a second overt act under the conspiracy charge. It reads:

"Dear Mr. Wells: By the time you receive this you will have probably heard of my retirement from the company. Some of my personal affairs have recently developed to a point where much of my time is going to be required, and it did not seem fair to the company that I should continue to draw a salary when I was unable to give my full time to its business. No other changes, I am sure, are contemplated, and things will of course go on just the same as before.

"Wishing you continued success, I am

"Sincerely yours,

"[Signed]     G. C. Stephens."

It is scarcely credible that he would have used such language in referring to a "retirement" consummated six months earlier, *"By the time you receive this* you will probably have heard," etc., "Some of my personal affairs have *recently* developed," etc. (Italics ours.) If in good faith and openly he had severed all connection with the business six months before, he would naturally assume that at least the major representatives of the company, like Wells and Leavitt, would have knowledge of it, or if unexpectedly he learned that they were ignorant of so important a fact, naturally he would have intimated surprise and would have advised them of the approximate date of his withdrawal. But assuming that he did in fact retire about January 1st as contended, manifestly no publicity was given; if those with whom he had been closely associated in the enterprise were ignorant of his withdrawal knowledge could hardly be imputed to the general public. He, with others, had set up and engineered an organization which for a long period had dealt fraudulently with the public and had used the mails for that purpose. He could not secretly withdraw and without doing more, disclaim responsibility for the continuing operation of a machine he had thus set in motion. In Hyde v. United States, 225 U. S. 369, 32 S. Ct. 793, 803, 56 L. Ed. 1114; Ann. Cas. 1914A, 614, it was said:

"The conspiracy accomplished or having a distinct period of accomplishment is different from one that is to be continuous. If it may continue, it would seem necessarily to follow the relation of the conspirators to it must continue, being to it during its life as it was to it the moment it was brought into life. If each conspirator was the agent of the others at the latter time, he remains an agent during all of the former time. This view does not, as it is contended, take the defense of the statute of limitations from conspiracies. It allows it to all, but makes its application different. Nor does it take from a conspirator the power to withdraw from the execution of the offense or to avert a continuing criminality. It requires affirmative action, but certainly that is no hardship. Having joined in an unlawful scheme, having constituted agents for its performance, scheme and agency to be continuous until full fruition be secured, until he does some act to disavow or defeat the purpose he is in no situation to claim the delay of the law. As the offense has not been terminated or accomplished, he is still offending."

The case is very different from Buhler v. United States (C. C. A.) 33 F.(2d) 382.

Counsel place emphasis upon the first sentence of this letter with the comment that it is a mere recital of a past event and argue that therefore the writing of it could not have contributed to the furtherance of the scheme or unlawful conspiracy. But in its entirety it was much more than that. It was manifestly intended to allay fears that the writer's withdrawal would prejudicially affect the business and to encourage the addressee to continue with it and carry it forward. That upon the announcement at this time of his retirement, there was deep concern lest as a result of suspicion and inquiries which were likely to follow, the whole enterprise would collapse, the record leaves no doubt. In short, not only did the defendant fail at the earlier date openly to disavow or otherwise do what was requisite to set in motion the statute of limitations, but at this time and within the three-year period, by his assurances he affirmatively contributed to the further execution of the unlawful enterprise.

On behalf of appellant Wells it is argued that, granting the validity of the judgment against the others, the evidence does not warrant a finding that he knowingly or "consciously" participated in the unlawful scheme or conspiracy; but upon a careful review we find it ample. True he did not play a major part, but that consideration concerns the degree of his moral delinquency. To it the trial court gave weight, for by the judgment punishment of imprisonment was imposed upon only Stephens, Spicer, and Wotkyns, whose relations to the conspiracy were such as to charge them with greater responsibility and render them more culpable than the other defendants for its fraudulent policies.

No other specifications of error have impressed us as requiring specific comment.

Judgment affirmed upon all counts except Nos. 9, 10, 12, and 13, and upon each of these four it is reversed.