**UNITED STATES of America**

v.

**Robert C. REID, Appellant.**

**No. 75–1657.**

United States Court of Appeals, District of Columbia Circuit.

Argued 15 Jan. 1976.

Decided 14 April 1976.

Plato Cacheris, Alexandria, Va., with whom Cary Mark Feldman, Washington, D.C., was on the brief for appellant.

Mark H. Tuohey, III, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, William D. Pease, Richard N. Stuckey, Asst. U. S. Attys., Washington, D.C., were on the brief for appellee. Bernard J. Panetta, II, Asst. U. S. Atty., Washington, D.C., also entered an appearance for appellee.

Before McGOWAN and WILKEY, Circuit Judges, and BRYAN,* United States District Judge for the Eastern District of Virginia.

Opinion for the Court filed by Circuit Judge WILKEY.

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

WILKEY, Circuit Judge:

Defendant Reid appeals from a conviction on three counts of mail fraud [1] after a nonjury trial before Judge Richey of the United States District Court. Originally charged in an eleven-count indictment, appellant was acquitted on six mail fraud counts by the trial judge, and the two embezzlement counts [2] were ordered dismissed by the court during trial.[3] Principally pressed on this appeal is the argument that the evidence was insufficient to sustain the charge that defendant Reid devised a scheme and artifice to defraud by knowingly approving false and inflated billings.

## I. OPERATIVE FACTS

From April 1972 until June 1973 Reid was employed as Credit Director of Woodward & Lothrop in Washington, D.C. During the period he was so employed, Reid was associated in some capacity, never fully defined by the evidence, with a collection agency known as Credit Shield in New York City.[4] What is more important and more clear is that the uncontradicted evidence, much of it stipulated, showed that during the period of the fraudulent scheme Reid received certain payments totalling $11,939.79 deposited in his own personal account and that of "Craig Roberts Associates" in the National Bank of Washington. "Craig Roberts Associates" was stipulated to be wholly owned, operated, and controlled by Reid.[5] These payments deposited were checks from Credit Shield and Harrington & Worth Services, Inc.,[6] a business entity in New York City which was used as a conduit to pass money originally paid out by Woodward & Lothrop back to Reid. Several corresponded in amount and time sequence with Woodward & Lothrop payments to Credit Shield. It is not necessary to detail the various transfers among Credit Shield, Harrington & Worth Services, Inc., Craig Roberts Associates, and appellant's own accounts, which originated from and can be tracked to the payments from Woodward & Lothrop, as these were not made the basis of any mailing count.[7]

What is important in understanding the scheme to defraud is the manner in which delinquent accounts for collection were referred by Woodward & Lothrop to Credit Shield, what Credit Shield did about them, how it invoiced Woodward & Lothrop, and what role appellant Reid and other employees played in the referrals and in making payment by Woodward & Lothrop to Credit Shield, for it was the mailing of three checks by Woodward & Lothrop from Washington to Credit Shield in New York

---

1. 18 U.S.C. § 1341.

2. 22 D.C.Code § 1202.

3. Tr. at 46.

4. Two witnesses testified that they had been informed in Reid's presence that he was an associate in Credit Shield and in the closely related organization Harrington & Worth. Tr. 54, 59–60, 62–64. Two other witnesses testified that he himself had indicated that he had helped establish Credit Shield. Tr. 92–95, 150–51, 158–60, 163–65. *See Respondent's Brief* at 4, n. 4.

5. Reid's full name is Robert Craig Reid.

6.

| Check Date | Amount | Drawn On | Account Deposited In |
|---|---|---|---|
| 4 Jan. '73 | $2,740.00 | Harrington & Worth Services | Craig Roberts |
| 15 Mar. '73 | 500.00 | Credit Shield | Craig Roberts |
| 14 May '73 | 5,000.00 | Credit Shield | Craig Roberts |
| 27 Aug. '73 | 700.00 | Harrington & Worth Services | Robert Reid |
| 27 Aug. '73 | 199.79 | Harrington & Worth Services | Robert Reid |
| 24 Sept. '73 | 800.00 | Harrington & Worth Services | Robert Reid |

(Date Deposited)

7. For example, a Woodward & Lothrop check for $2,740 was used as the opening deposit in the Credit Shield account on 2 January 1973. This account was opened by the two principals in Harrington & Worth Services, Inc. On 10 January 1973 Credit Shield issued a check for $2,700 to Harrington & Worth Services, Inc. This was obviously in payment for the $2,740 check from Harrington & Worth Services, Inc., issued to appellant Reid and deposited in his own account on 5 January 1973.

Similarly, a $5,000 check from Credit Shield, whose funds originated from payment by Woodward & Lothrop, was deposited by appellant Reid in his Craig Roberts Associates account on 18 May 1973. This followed by one day the deposit of a $5,000 Woodward & Lothrop check in the Credit Shield account on 17 May 1973.

on which Reid was convicted of three counts of mail fraud.

In autumn 1972 Woodward & Lothrop made arrangements with several collection agencies for the collection of delinquent accounts at a cost of $2.50 for each account serviced. This project was handled by appellant as Credit Director. The two principal agencies were Credit Shield and National Credit Records of America, both located in New York. On 27 November 1972 a memorandum from Mr. Cozzi, Credit Sales Manager, directed Mr. Saunders, Supervisor of the Collection Department, to send approximately half of the accounts to Credit Shield and half to NCRA. Cozzi's testimony was that, beginning in November 1972 through the period into June 1973, approximately every other account was sent to Credit Shield and the remainder to NCRA.[8]

The mechanism of account selection was this: The individual collection cards kept by Woodward & Lothrop would be reviewed monthly, in nine cycles, each covering several letters of the alphabet. A list of accounts which were 90 days in arrears would be prepared by Saunders for each cycle, and sent, on alternate cycles, to Credit Shield and NCRA. Saunders retained a carbon copy of the list for updating purposes. Credit Shield then prepared the first of a series of three dunning letters to the delinquent customers, and sent back to Woodward & Lothrop individual account tickets and a computer printout stating the accounts thus serviced.[9] Saunders, Supervisor of the Collection Department, kept his copy of the original list updated as overdue payments were received, and sent notification of such "activity" to Credit Shield, on the individual account tickets. If no change in the status of the account had occurred, the account tickets were retained by Saunders.

One fact about which legal controversy swirled at the trial, and which assumes some importance on this appeal, is that the carbon copy of the lists prepared by Saunders for November 1972 through part of February 1973, were not retained after the third and final dunning letter had presumably been sent out. Saunders retained the computer printouts received from Credit Shield as the only record of the accounts sent. For the months of March (and the latter part of February) through June 1973, apparently no computer printouts were received and the original lists were retained.

While the original Saunders list and the Credit Shield computer printout contained the account number, name, address and amount due of each account, the information which Cozzi gave to defendant Reid was simply a notation on a small piece of paper as to the alphabetical cycle of the list sent, the number of accounts, and the total dollar amount.[10] It was Reid's responsibility to check the invoices received from Credit Shield for services allegedly rendered, and this information was sufficient to enable him to do this.

Reid's secretary gave all incoming invoices to him, which he approved for payment by a brief handwritten notation with date and signature.[11] Approved invoices were sent to the Accounts Payable Department. Two or three days after receipt of each invoice from Reid's office a person in the Accounts Payable Department typed a check, had it approved by the Accounts Payable supervisor, and after it was machine signed sent the check to the correspondence room for mailing.[12] Regularly at 4:00 p. m. each day the Accounts Payable Department took all checks addressed to out-of-state accounts to the correspondence room where the checks were placed in envelopes, run through a machine, and placed

---

8. Tr. at 349.

9. The Government sought to introduce the computer printouts into evidence, but they were ruled inadmissible by the trial judge.

10. Tr. at 350.

11. Tr. at 325.

12. Tr. at 329–30.

in a United States mailbag in which they were taken to the United States Post Office.[13]

During the period of the mail fraud scheme—November 1972 to June 1973[14]—nine Woodward & Lothrop checks were processed and sent to Credit Shield in this fashion.[15] The three checks involved in the three counts on which Reid was found guilty of mail fraud were dated 5 March 1973 in the amount of $2,495, 3 April 1973 for $2,722.50, and 8 June 1973 for $1,166. The checks were deposited in one of several interrelated accounts at Bankers Trust Company in New York City.

## II. THE SCHEME TO DEFRAUD

The scheme to defraud was basically simple. Saunders at Woodward & Lothrop sent a list of delinquent accounts to Credit Shield for collection. Credit Shield presumably wrote the requisite one to three dunning letters in regard to those accounts referred. However, the invoices sent to Woodward & Lothrop, billing at $2.50 per account, over the months of the scheme could be found by the trier to total more than twice the number of accounts originally referred by the store. Reid, as Credit Director of Woodward & Lothrop, nonetheless approved payment of the invoices and sent them directly to the Accounts Payable Department for payment. These checks were typed and mailed in the normal course

of business to Credit Shield in New York. Three such mailings were the mail fraud counts on which Reid was convicted. Credit Shield in turn remitted to Reid a substantial part of the money thus received, by checks drawn upon itself or upon its affiliate, Harrington & Worth Services.

Under the system used in the credit department of Woodward & Lothrop, Reid provided the only direct check on the correctness of the invoices sent by Credit Shield and the payments made by Woodward & Lothrop. He was to perform this function by comparing the invoices against the slips of paper provided to him by Cozzi, which set forth the number of accounts which had been referred for each cycle.[16] This Reid signally failed to do, as he was concurrently receiving back from Credit Shield part of the inflated payments he caused Woodward & Lothrop to make to Credit Shield.

The issue on this appeal is appellant Reid's contention that the evidence adduced by the Government, a large part by stipulation and otherwise by uncontradicted evidence, was insufficient to show either that any single invoice (and the check issued pursuant thereto) was inflated or that the total paid by Woodward & Lothrop during the period of the conspiracy, or any given portion thereof, was greater than the rightful amount which Woodward & Lothrop should have paid on the basis of the number of accounts referred by Woodward & Lothrop to Credit Shield.[17]

13. Tr. at 337.

14. The indictment alleges a scheme running "[f]rom on or about August 18, 1972, up to and including on or about September 5, 1973 . . . ." We need not decide whether the scheme was ongoing for this entire period in order to decide this case.

15.

| Invoice Date | Number of Accounts | Amount | Date Check Approved | Check No. |
|---|---|---|---|---|
| 29 Nov. '72 | 1062 | $2,655.00 | 4 Dec. '72 | 96911 |
| 21 Dec. '72 | 1096 | 2,740.00 | 28 Dec. '72 | 114092 |
| 3 Jan. '73 | 491 | 1,229.75 | 5 Jan. '73 | 110942 |
| 5 Feb. '73 | 1109 | 2,775.75 | 6 Feb. '73 | 98552 |
| 1 Mar. '73 | 998 | 2,495.00* | 5 Mar. '73 | 127826 |
| 28 Mar. '73 | 1089 | 2,722.50* | 3 Apr. '73 | 120476 |
| 1 May '73 | Reactivation Promotion | 5,000.00 | 5 May '73 | 124182 |
| 18 May '73 | Reactivation Promotion | 5,000.00 | 21 May '73 | 122543 |
| 8 June '73 | 426 | 1,166.00* | 8 June '73 | 126295 |

\* Checks constituting counts on which Reid was convicted of mail fraud.

16. Cozzi and Saunders had access to the original typed lists prepared by Saunders, which were regularly destroyed, and the computer printouts listing the referred accounts. However, neither's functions called on him to see the Credit Shield invoices and thus to check the comparative numbers.

17. There is substantial evidence in the record that, in addition to the activities which are the subject of the indictment, defendant Reid was also receiving kickbacks from collection and credit reporting agencies, in exchange for his referrals of Woodward & Lothrop and other business. In particular there was testimony that he received 5% of all collections made for Woodward & Lothrop by John Francomano, Tr. at 85, and that he received approximately $300.00 per month for 14 months, from Braden Maryhew, after referring to Maryhew some of Woodward & Lothrop's credit reporting business. Tr. at 185–86.

## III. SUFFICIENCY OF THE EVIDENCE AND THE APPLICABLE LAW OF MAIL FRAUD

▪ We think the evidence clearly sufficient to show a scheme to defraud and that the scheme was intended to cause Woodward & Lothrop to pay during the period of the scheme far more to Credit Shield than the number of accounts referred by Woodward & Lothrop to Credit Shield would justify. There was ample evidence of such a scheme lasting for the entire period from November 1972 to June 1973.[18] Even more clearly, the fraudulent scheme is established for the limited period from late February 1973 through June 1973, for which original account lists were retained by Woodward & Lothrop. The mailings made the subject of the three counts on which defendant was found guilty were indubitably pursuant to or in furtherance of the scheme, and indeed there is no contention that such mailings were not in furtherance of the scheme, if the scheme itself was established.[19]

The alleged weakness of the Government's case, the purported insufficiency of the evidence, arises from the operational system of the Woodward & Lothrop Credit Department and the rulings on evidence of the trial judge. As described above, Saunders prepared a typewritten list of delinquent customers' accounts, which was destroyed when there were no more dunning letters to be sent out. The computer printout furnished by Credit Shield, represented to be prepared from this list, was retained. Saunders testified that he had no personal recollection of the number of accounts which he referred to Credit Shield and to NCRA beginning 27 November 1972, although he said that, pursuant to his instructions from Cozzi, an approximately equal number were sent to each bill collecting agency. Furthermore, Cozzi made a handwritten notation of the total number of accounts and the amounts involved, dated and initialed it, and furnished this to defendant Reid for Reid's use in checking the validity of the invoices subsequently sent by

---

**18.** Cozzi testified that the Credit Department began preparations for the Credit Shield program in October, but did not refer any accounts until the time of his 27 November memorandum re the division of referrals between Credit Shield and NCRA. Tr. at 348–49.

In reviewing the sufficiency of the evidence to support a conclusion below, the evidence is to be viewed in a light most favorable to the conclusions which the finder of fact has reached. This rule applies in criminal as in civil matters, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942), and whether the finder of fact is a judge or a jury, *United States v. James*, 147 U.S.App. D.C. 43, 45 n. 2, 452 F.2d 1375, 1377 n. 2 (1971). The presumption of innocence operative in the trial of a criminal offense does not apply at the appellate level.

**19.** The statute's "in furtherance" requirement apparently serves only a jurisdictional purpose, assuring a reasonable connection between the scheme to defraud and the use of the instrumentality over which federal power exists. Under the parallel wire fraud statute, 18 U.S.C. § 1343, it has been held that use of the federally

regulated instrumentality need not even be foreseeable. *United States v. Blassingame*, 427 F.2d 329, 330 (2d Cir. 1970), *cert. denied*, 402 U.S. 945, 91 S.Ct. 1629, 29 L.Ed.2d 114 (1971). Clearly the use of the mails was foreseeable to the defendant in this case as an integral part of the scheme to defraud. However, *Blassingame* is nonetheless instructive as to the relatively tenuous relationship to a federal instrumentality which may be sufficient to establish federal jurisdiction over the offense, and therefore as to the relatively loose manner in which the "in furtherance" requirement should properly be construed. *See* note 33 *infra.*

Thus we do not need to reach the Government's alternative theory that there was a scheme to deprive Woodward & Lothrop of the honest, faithful, and loyal performance of duties by defendant Reid, and that the use of the mails in furtherance thereof constituted a violation of the mail fraud statute. With relation to this alternate theory, appellant Reid does contend that the mailings would not be in furtherance of that scheme, if such existed, distinct from his position on the scheme to defraud which we find did exist.

Credit Shield. Reid's secretary testified that although Reid put these invoices in the Credit Shield file kept in a cabinet behind his desk, as he did similar invoices regarding NCRA, after Reid's departure following a requested resignation in June 1973, all of the Credit Shield files previously kept in that cabinet by Reid were missing.

For the period from the beginning of the referrals in November 1972 through February 1973, only one type of real evidence was actually admitted to establish the number of delinquent accounts referred to Credit Shield.[20] The absence of the Credit Shield slips from the file cabinet in Reid's office after he left Woodward & Lothrop allowed the trier of fact a permissible inference that Reid himself removed these files containing evidence of his knowledge of the actual number of accounts sent to Credit Shield. The trial judge therefore permitted the introduction into evidence of the similar notations furnished Reid reflecting the monthly total of accounts sent to NCRA, together with the actual invoices of NCRA, for the period November 1972 to February 1973.[21] This evidence showed that NCRA received 787, 376, 425, and 402 accounts during the four months.[22] The total of 1,990 accounts referred to NCRA, coupled with Cozzi's and Saunders' testimony as to the equal distribution of the accounts between Credit Shield and NCRA, provided the evidence to show that Credit Shield received approximately 1,990 accounts during the four months of November, December, January, and February.[23]

It is this period of four months for which the appellant asserts that the evidence was insufficient to provide any kind of a factual foundation establishing a scheme to defraud by causing payments to be made by Woodward & Lothrop in excess of the number of accounts actually referred to Credit Shield. Given the circumstance of the evidence of the slips re Credit Shield missing from appellant's custody, the NCRA slips were admissible and, coupled with other evidence, were sufficient to establish the scheme to defraud as in operation for that four-month period.

Appellant has argued in brief and orally as if it were necessary in a mail fraud case for the Government to prove by mathematical accounting exactitude the amount by which the victim was defrauded by the action of the accused. It is only necessary to establish a scheme to defraud, and a mailing in furtherance thereof; it is not necessary even to show that a loss took place.[24] Here we think the evidence established a scheme to defraud, a scheme to cause Woodward & Lothrop to pay a substantial amount in excess of what could have been rightfully charged the store on

---

20. The carbon copy of the list sent by Woodward & Lothrop to Credit Shield had been discarded after all dunning letters had ostensibly been sent out. The computer printouts sent by Credit Shield to Woodward & Lothrop were ruled inadmissible. *See* note 9 and text accompanying, *supra*.

21. Tr. 139–40, 353.

22. *Petitioner's Brief* at 15.

23. We note that Saunders did testify that the typewritten list available to him for February indicated only seven accounts were referred in that month to Credit Shield. Tr. at 309. However, earlier in his testimony Saunders stated seven was the number of accounts sent in February for which Credit Shield had not sent back an update ticket. Tr. at 269.

 The figure of seven is totally inconsistent with the number of accounts habitually referred to Credit Shield before February and afterwards, and totally inconsistent with any idea that the accounts were split approximately equally between Credit Shield and NCRA. We think the trial judge could justifiably have estimated the accounts sent to Credit Shield at 402, which was the number shown by the available record to have been referred to NCRA during the month of February.

24. *United States v. George*, 477 F.2d 508, 512 (7th Cir.), *cert. denied, Greensphan v. United States*, 414 U.S. 827, 94 S.Ct. 49, 38 L.Ed.2d 61 (1973); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180–81 (2d Cir. 1970); *Post v. United States*, 132 U.S.App.D.C. 189, 196 n. 42, 407 F.2d 319, 326 n. 42 (1968), *cert. denied*, 393 U.S. 1092, 89 S.Ct. 863, 21 L.Ed.2d 784 (1969); *New England Enterprises v. United States*, 400 F.2d 58, 72 (1st Cir. 1968), *cert. denied*, 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969); *Adjmi v. United States*, 346 F.2d 654, 657–68 (5th Cir.), *cert. denied*, 382 U.S. 823, 86 S.Ct. 54, 15 L.Ed.2d 69 (1965).

the basis of the number of delinquent accounts referred to Credit Shield. While all of the evidence indicates that Woodward & Lothrop paid approximately double the amount actually due, the exact amount of loss is legally immaterial.

The Government, however, was successful in establishing more precisely the exact amount of loss for the months of March, April, May, and June. For this period the list of accounts sent to Credit Shield had not been destroyed.[25] Saunders testified that accounts in the number of 175 in March, 307 in April, 218 in May, and 310 in June [26] were sent to Credit Shield for collection. The total of 1030 accounts referred was thus firmly established.

If the total of approximately 1,990 accounts referred to Credit Shield in November-February inclusive, is added to the 1,030 accounts established precisely as referred to Credit Shield in the period March-June, inclusive, the total of 3,020 represents the approximate number of accounts referred for collection by Woodward & Lothrop to Credit Shield from late November to early June when business with Credit Shield halted. Beginning 29 November 1972 through 5 June 1973 Credit Shield sent Woodward & Lothrop invoices representing a total of 6,271 accounts at $2.50 per account.[27] In response to these invoices Woodward & Lothrop mailed seven checks for a total of $15,784 to Credit Shield.[28]

It is readily apparent that considering the scheme overall from November through June the number of 6,271 accounts is more than double the 3,020 accounts shown to have been referred by Woodward & Lothrop to Credit Shield. Similarly, the payment of $15,784 is substantially in excess of the $7,550 which Credit Shield would have been justified in billing for the 3,020 accounts.

Alternatively, even if it be considered that the Government proof failed for the period November-February, inclusive, in regard to the exact number of accounts referred, the trier could have found that at least 1,515 accounts [29] were invoiced by Credit Shield from 28 March 1973 through 5 June 1973, that this number greatly exceeded the 1,030 accounts referred by Woodward & Lothrop during the March-June period, and that there should have been a correlation between the two numbers thus compared.

It is objected by the appellant that it is impossible to tie in any given Credit Shield invoice and the check made in payment thereof with any specific number of referrals by Woodward & Lothrop, and this is generally true. But if we look at the state of the account between the store and the collection agency beginning with the first invoice of 29 November 1972 and concluding with the fourth invoice on 5 February 1973,[30] it surely was open to the trier to find that Credit Shield was invoicing on a monthly basis—beginning very promptly after the first referral around 27 November—and that each and every invoice was paid in the exact amount by Woodward &

25. Government Exhibits 40A–J.

26. Tr. 309–10.

27. *See* note 15 *supra.*

28. This total ignores the two checks of $5,000 each, which were made for the "reactivation promotion" which Credit Shield purportedly undertook on behalf of Woodward & Lothrop. While this may have been a part of the scheme to defraud, the proof failed as to any lack of performance by Credit Shield on this reactivation promotion program, and appellant Reid was found not guilty on these two counts. For clarity the invoices and checks in payment thereof have been excluded completely from the court's calculations here, although they did form the subject of two mailing counts on the indictment on which Reid was acquitted. The payment of $15,784 is more than the $15,677.50 which at $2.50 each would be payable for 6,271 accounts, but the discrepancy in the record seems immaterial.

29. *See* note 15 *supra.* Some or all of the accounts included on the 1 March invoice may also properly be chargeable to March rather than February. Insofar as this is true (which can not be ascertained from the record), it increases the discrepancy between accounts actually referred during this later period and the number for which Credit Shield billed.

30. *See* note 15 *supra.*

Lothrop, the fourth invoice of 5 February 1973 being paid by check of 6 February 1973. After payment of the 1 March 1973 invoice, Woodward & Lothrop was current through February, and perhaps part of March, and the remaining period of March, April, May, and June 1973 can be considered as a separate period in which 1,030 accounts precisely were referred and at least 1,515 were invoiced for payment.

As stated above, the appellant argued not only that the evidence was insufficient to establish the scheme for the entire period November 1972 to June 1973 but also that no particular invoice or check forming the basis of a mailing count was shown to be in itself an excess billing or an excess payment. Under the mail fraud statute it is not necessary that the individual mailing relied upon by the prosecution be shown to be in any way false or inaccurate, if the matter mailed is utilized in furtherance of or pursuant to the scheme to defraud.[31] Certainly these three checks made the basis of the three mailing counts on which defendant Reid was convicted meet this test.

As a matter of practicality, in most schemes to defraud, it would be very difficult for the prosecution to show that any particular check or invoice was in itself false or inflated in amount, because in a course of dealing over a period of months the bills sent and the payments made are not necessarily tied in with ascertainable and accurate accounting data. In fact, it may be assumed that persons engaged in such a scheme to defraud would take some pains *not* to tie in the invoices and checks with other records which would be in the hands of the person or company being defrauded, in order to escape detection.

A good example is the case at bar. None of the Credit Shield invoices indicated by date and number which referrals were the subject of the invoices.[32] If these invoices had happened to fall into the hands of either Saunders or Cozzi, aside from Reid the Woodward & Lothrop employees best informed about these collection matters, neither Saunders nor Cozzi would have been able to fault any given invoice as being excessive or falsified, as there was nothing on it to indicate what period or what account submission the invoice covered. The only way Saunders and Cozzi could have detected the scheme would have been if either had become suspicious, gone back to his Woodward & Lothrop records as to the total number of accounts which had been referred to Credit Shield since the beginning, and compared that with the total number of accounts to date invoiced for payment by Credit Shield, including the last invoice which may have aroused suspicion.

In other words, the only way Woodward & Lothrop could have detected the fraudulent scheme would have been to make an investigation to undercover the same proof which the Government offers here, *i. e.*, the overall comparison of the total accounts referred with the total accounts invoiced by Credit Shield and paid by Woodward & Lothrop. It would never have been possible for Woodward & Lothrop to have compared an individual invoice or check with the number of accounts referred at any given time, as appellant Reid contends should have been the nature of the Government's proof here. The scheme was designed by Reid so that the overall totals were the only comparison which would reveal the fraud, and this is the proof the Government offered.

Actually, as we know from the description of the Woodward & Lothrop business procedures given by documents and witnesses at the trial, neither Saunders nor Cozzi was ever in a position to check the

---

**31.** *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *United States v. Kram*, 247 F.2d 830, 832 (3d Cir. 1957); *Holmes v. United States*, 134 F.2d 125, 134 (8th Cir.), *cert. denied*, 319 U.S. 776, 63 S.Ct. 1434, 87 L.Ed. 1722 (1943); *United States v. Hoffa*, 205 F.Supp. 710, 716 (S.D.Fla.). *cert. denied, Hoffa v. Lieb*, 371 U.S. 892, 83 S.Ct. 188, 9 L.Ed.2d 125 (1962).

**32.** Government Exhibits 1–9.

Credit Shield invoices, as these were always sent to appellant Reid for approval for payment. Reid himself was armed by Cozzi with the correct information on the number of delinquent accounts which had been referred to Credit Shield for collection, presumably for the purpose of checking the Credit Shield invoices by these correct totals when the invoices came in. But then the watchdog Reid was himself the perpetrator of the scheme to defraud. Reid approved the invoices and sent them directly to the Accounts Payable Department where a check was written, and the mailing took place without any knowledgeable employee of Woodward & Lothrop being in a position in the chain of the scheme to have interrupted it.

 Applying the basic principles of mail fraud law to the case at bar, we take the Supreme Court's definition: "The ele-

ments of the offense of mail fraud under 18 U.S.C. [§ 1341] are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme. It is not necessary that the scheme contemplate the use of the mails as an essential element." [33] It is the scheme to defraud and not actual fraud that is required. Fraudulent intent may be inferred from the modus operandi of the scheme.[34] "The law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity." [35] The proof of the scheme, its detailed operation, and the excess payments by Woodward & Lothrop caused by the scheme from November 1972 to June 1973 were in evidence. The fraudulent intent and the nature of the scheme were undeniably apparent from the undisputed evidence.

 The mailings of the Woodward & Lothrop checks, the lifeblood of the

33. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435, 444 (1954). In the only three cases in which the Supreme Court appears to have restricted the scope of § 1341—*United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960); and *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944)—the rationale was that the mailings charged were not sufficiently closely related to the execution of the proven scheme to defraud. *See United States v. Sampson*, 371 U.S. 75, 79–81, 83 S.Ct. 173, 175–76, 9 L.Ed.2d 136, 139–40 (1962). As Justice Rehnquist remarked in *Maze*, "Indeed, from [the defendant's] point of view, he probably would have preferred to have the invoices misplaced by the various motel personnel and never mailed at all." 414 U.S. at 402, 94 S.Ct. at 649, 38 L.Ed.2d at 609.

Here appellant Reid makes no point that the mailings of the three checks were not pursuant to or in furtherance of a scheme to defraud if such a scheme were established. They obviously supplied the funds which were later to be relayed to him. His argument is that neither the individual checks, nor the individual invoices, nor the totals overall were shown to be excessive. We find proof of excess in individual check or invoice legally immaterial and unnecessary, and proof of overall excess in totals of checks and invoices abundant, thus constituting part of the proof of a scheme to defraud.

34. As Judge Leonard Moore summarized the principles and authorities:

Since only a "scheme to defraud" and not actual fraud is required for conviction, we

have said that "it is not essential that the Government allege or prove that purchasers were in fact defrauded." *United States v. Andreadis*, 366 F.2d 423, 431 (2d Cir. 1966). But this does not mean that the government can escape the burden of showing that some actual harm or injury was *contemplated* by the schemer. Proof that someone was actually defrauded is unnecessary simply because the critical element in a "scheme to defraud" is "fraudulent intent," *Durland v. United States*, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896), and therefore the accused need not have succeeded in his scheme to be guilty of the crime. *E. g., Pritchard v. United States*, 386 F.2d 760 (8th Cir. 1967); *Adjmi v. United States*, 346 F.2d 654 (5th Cir. 1965). But the purpose of the scheme "must be to injure, which doubtless may be inferred when the scheme has such effect as a necessary result of carrying it out." *Horman v. United States*, 116 F. 350, 352 (6th Cir. 1902). Of course proof that someone was actually victimized by the fraud is good evidence of the schemer's intent.

*United States v. Regent Office Supply Company*, 421 F.2d 1174, 1180–81 (2d Cir. 1970). *See United States v. George*, 477 F.2d 508, 512 (7th Cir.), *cert. denied, Greensphan v. United States*, 414 U.S. 827, 94 S.Ct. 49, 38 L.Ed.2d 61 (1973); *New England Enterprises v. United States*, 400 F.2d 58, 72 (1st Cir. 1968), *cert. denied*, 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969).

35. *Weiss v. United States*, 122 F.2d 675, 681 (5th Cir. 1941).

scheme from the defendant Reid's point of view, were clearly established and just as clearly pursuant to and in furtherance of the scheme to defraud. The courts have taken a broad view of the nature of the mailings that can be said to be in execution of the scheme to defraud. Of course, a material false statement contained in a document sent through the mails clearly constitutes a fraudulent misrepresentation and violation of the statute. But the matter mailed need not be fraudulent in itself; it is enough that it somehow aids in the execution of the fraudulent scheme.

For example, in *Pereira v. United States*[36] two con-men successfully induced a middle-aged widow to put in their possession substantial sums of money, by misrepresenting themselves and their intentions. Defendants did not directly utilize the mails in their scheme to defraud—the only mailing involved was the forwarding of checks for collection from the Texas bank where they were cashed to the California bank on which they were drawn. Since the fraud involved was in procuring the checks from the widow, there was nothing fraudulent or false about the checks themselves. There was nothing false about them, but, like the three checks here, they contained the proceeds of the fraud. The Supreme Court nevertheless upheld convictions for mail fraud on the basis that the collection of the checks was a necessary and foreseeable event if the scheme to defraud was to succeed, so that the two essential elements of (1) a scheme to defraud and (2) a mailing in furtherance were satisfied.

And so in appellant Reid's case, it is totally immaterial that not one of the invoices from Credit Shield to Woodward & Lothrop was shown to be in excess of any particular referrals of delinquent accounts by Woodward & Lothrop. It is similarly immaterial that it was not shown that any particular check sent by Woodward & Lothrop to Credit Shield was in excess of any rightful charge that Credit Shield might have made at that time for its services. It was sufficient, and it was amply shown, that there was a fraudulent scheme operated by appellant Reid to enrich himself, and that the mailings of the checks by Woodward & Lothrop were in furtherance of that scheme.

The case was proved and the conviction is

*Affirmed.*

**36.** 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435, 444 (1954). *See* other cases cited note 34, *supra.* Likewise, in *Stephens v. United States*, 41 F.2d 440 (9th Cir.), *cert. denied, Spicer v. United States*, 282 U.S. 880, 51 S.Ct. 83, 75 L.Ed. 777 (1930), the court made it clear the particular mailings were in execution of the scheme to defraud, even though they were not only legitimate on their face but also the particular transaction to which they related was itself proper. There the defendants had taken over a legitimate business but expanded it by illegitimate means, including false representations and deceptive practices. The defendants contended that the mailings which formed the basis of the substantive counts were not illegal because they were made in the promotion of the lawful features of the business, or at least that the evidence failed to show any connection between the mailings and those branches of the business which were promoted by deception. In overruling that contention, the court said:

But direct connection was not requisite. The business was a single general enterprise, and a lawful activity in the course thereof might very well have made a material contribution to the success of another activity illegitimate in its purpose or fraudulent in the means used in carrying it forward. . . . If fraudulent in important and continuing branches of its activities, the enterprise as a whole may properly be characterized as a fraudulent scheme.

*Id.* at 447.

And in *Mitchell v. United States*, 126 F.2d 550 (10th Cir.), *cert. denied*, 316 U.S. 702, 62 S.Ct. 1307, 86 L.Ed. 1771 (1942), defendant sold gas and oil leases on the misrepresentation that an oil company which he represented would purchase them for a much larger sum than that paid. The specific uses of the mail charged were (1) a letter from the defendant to a lease broker ordering gas and oil leases, (2) the mailing of the lease by the broker to the defendant, (3) the mailing of the lease by the victim to the Commissioner of Public Lands for Recording, and (4) the return of the lease by the Commissioner to the victim. None of these mailings was fraudulent in itself; indeed, the first two involved merely the purchase of leases by the defendant himself. Yet they were held to be in violation of the mail fraud statute because, in relation to the total picture, the mailings were a part of a continuing scheme to defraud.