UNITED STATES of America, Appellee,

v.

James A. BRIEN, Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

Thomas LABUS, Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

Robert Ralph ZOLLA, Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

Michael SHUSTER, Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

Stephen BUZZI, Defendant-Appellant.

Nos. 79–1164 to 79–1168.

United States Court of Appeals, First Circuit.

Argued Oct. 5, 1979.

Decided Feb. 26, 1980.

Certiorari Denied April 28, 1980.

See 100 S.Ct. 1854.

Daniel J. Kornstein, New York City, for defendant-appellant, James D. Brien.

Barry M. Fallick, New York City, with whom Platzer & Fallick, New York City, was on brief, for defendants-appellants, Thomas Labus and Michael Shuster.

Andrew Good, Boston, Mass., by appointment of the Court, for defendant-appellant, Robert Ralph Zolla.

Walter Munsen, Boston, Mass., with whom Jessica de Koninck and de Koninck & Munsen, Boston, Mass., were on brief, for defendant-appellant, Stephen Buzzi.

Michael A. Collora, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL and BOWNES, Circuit Judges, BONSAL,* Senior District Judge.

BOWNES, Circuit Judge.

Defendants-appellants James Brien, Thomas Labus, Michael Shuster, and Robert Ralph Zolla, all former management employees of Lloyd, Carr & Company, appeal their convictions for conspiring[1] to commit

---

* Of the Southern District of New York, sitting by designation.

1. Conspiracy to violate federal law is prohibited by 18 U.S.C. § 371:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
>
> If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

mail [2] and wire [3] fraud in the sale of futures contracts in commodities traded on markets in London, England. The appellants are joined by Stephen Buzzi, a former Lloyd, Carr & Company salesman, in appeals of convictions for the commission of mail and wire fraud in the sale of London commodity options. We affirm all convictions.

There are five issues on appeal: (1) the validity of the search of a business premises and the seizure of business records; (2) whether the Commodities Futures Trading Act (CFTA) preempts or impliedly repeals the general mail and wire fraud statutes; (3) the correctness of the jury instructions; (4) a variance as to one count in the indictment; and (5) whether preindictment publicity was so prejudicial as to require dismissal of the indictment.

*The Facts*

Lloyd, Carr & Company (Lloyd, Carr) was founded in 1976 by Alan Abrahams, a/k/a James Carr, to sell London commodity options [4] to investors in the United States. Abrahams hired each of the defendants during 1976. All but Buzzi eventually assumed management positions with Lloyd, Carr. Thomas Labus, hired to head Lloyd, Carr's research department, also assumed responsibility for training new salesmen and served on Lloyd, Carr's Board of Directors. James Brien progressed from salesman to national sales manager and a member of the Board of Directors. Robert Ralph Zolla rose from salesman to sales floor supervisor of the Boston office, Lloyd, Carr's principal and largest office. Michael Shuster, originally hired as a salesman in Lloyd, Carr's Greenwich, Connecticut, office, became assistant manager of that office, and then manager of Lloyd, Carr's San Francisco office.

Lloyd, Carr sold commodity options through the use of "boiler room" [5] sales

2. Use of mails in furtherance of any scheme to defraud is prohibited by 18 U.S.C. § 1341:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

3. Use of interstate wire communications in furtherance of any scheme to defraud is prohibited by 18 U.S.C. § 1343:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

4. The purchaser of a commodity option obtains the right to buy or sell a futures contract in a specific commodity at a fixed price for a fixed period of time. Purchase of the option is, in effect, a wager that the market value of the specified commodity will rise higher during the fixed option period than the fixed price of the option, thereby allowing the option holder to buy and sell the futures contract at a profit. For the holder to make a profit, the market price of the commodity must rise higher than the sum of the contract price, the option price (the premium) and any transactions costs, including brokerage commissions.

5. A "boiler room" sales operation was concisely described in *S. E. C. v. R. J. Allen Associates, Inc.*, 386 F.Supp. 866, 874 (S.D.Fla.1974):

"Boiler room" activity consists essentially of offering to customers securities of certain issuers in large volume by means of an intensive selling campaign through numerous salesmen by telephone or direct mail, without regard to the suitability to the needs of the customer, in such a manner as to induce a hasty decision to buy the security being offered without disclosure of the material facts about the issuer.

operations. Salesmen, attracted to Lloyd, Carr by advertisements containing inflated estimates of their commissions and other benefits, were hired without regard to their knowledge of the commodities market. Once hired, salesmen were trained for a few days in telephone sales techniques and the subtleties of selling commodities options. They were then given a desk and a phone in a large room filled with other salesmen, and instructed to call persons whose names were obtained from Dun & Bradstreet investor lists. The prospects were called "cold" and exhorted to purchase commodity options from Lloyd, Carr. Lloyd, Carr salesmen were required to make at least one hundred calls per day, which resulted on the average in one or two sales. During one month, more than 155,000 long distance calls were made from Lloyd, Carr's Boston office. Sales commissions ranged from eight to fifteen percent of the option price. Turnover in salesmen was high.

To assist its salesmen, Lloyd, Carr provided them with scripts of "canned" sales pitches for the initial or "set up" call and follow-up calls. The purposes of the "set up" call were to "qualify" the investor by determining the extent of his interest and financial resources and to stimulate his interest in London commodity options. Interest was aroused by making false, deceptive and misleading statements about the likelihood of large increases in the price of particular commodities, about the actual cost of dealing in commodity options, and by misrepresenting important facts concerning Lloyd, Carr's method of operations. Salesmen often claimed that Lloyd, Carr's market predictions were the product of a research department with a budget of one million dollars per year; in fact, a few part-time employees staffed the research department. Salesmen told investors that sales commissions were only ten to fifteen percent of the option price; in fact, while salesmen earned only that amount, Lloyd, Carr marked up the price of options in amounts ranging from seventy-two to five hundred percent of the market price and concealed that from investors. Salesmen informed investors orally and in writing that their funds would be placed in "customer segregated accounts" immune from attachment; in fact, no such accounts existed and Lloyd, Carr accounts were attached with increasing frequency as its legal difficulties mounted. Salesmen assured investors that options would be purchased on the day of the order; in fact, many options were not purchased until days or weeks after the order, thereby depriving investors of gains to be made in a rising market. Investors were frequently told that purchases had been made when they had not, and were denied the right to cancel orders on that basis. Although investors were told that their profits would be returned to them within forty-eight hours, many were forced to sue to obtain their profits.

Most importantly, Lloyd, Carr deceived investors as to how a profit could be made in commodity options. It repeatedly informed investors that they would realize a profit for every increase in the price of the commodity underlying the option. In fact, no profit could be realized until increases in the market price of the commodity also covered the cost of the purchase of the option. The cost of the purchase of the option included brokers' fees in addition to Lloyd, Carr's huge premiums. Lloyd, Carr often represented that its option prices were lower than its competitors; in fact, its enormous markups resulted in option prices three or four times larger than those of its competitors. Finally, despite the fact that Lloyd, Carr's pricing mechanisms increased the risk of the purchase of a type of option already generally recognized as risky, Lloyd, Carr told investors that commodity options presented only a limited investment risk.

After the "set up" call salesmen sent investors a mailing containing various pamphlets and sales literature. This material included false, deceptive, and misleading statements similar to those made in the "set up" call. A steady barrage of follow-up calls to qualified investors followed the mailing, which continued the established pattern of false, deceptive, and misleading statements and injected a new component:

high pressure salesmanship. In these calls, salesmen focused on the natural uncertainties of investors; the low risk, the huge return and Lloyd, Carr's record of success were emphasized in the context of the urgent need to invest immediately. Investors were also told that eighty-two percent of Lloyd, Carr's previous customers made money. In fact, nearly that percentage lost all of their investment. Often, when an investor hesitated, a second salesman was called to the phone to pose as an "expert" in the particular commodity and to corroborate the first salesman's claims.

Testimony at trial showed that this was the standard method of operation. The evidence also showed that the management of Lloyd, Carr intentionally created a pressurized "circus-like" atmosphere in which unusual and bizarre efforts to make sales became commonplace. Sales managers established quotas and fired those who failed to meet them. Prizes, including money, mopeds, and appliances were used to stimulate performance. Cash bonuses were paid to those who stood on their desks or removed their shoes, socks, ties, shirts or blouses while consummating a sale. Sales managers sometimes dressed in gorilla suits or drove mopeds around the floor to energize the sales force. Sales were celebrated by the ringing of gongs and cowbells and by cheering from the sales force. Fear, too, played a role. Firings were frequent and capricious. During one slow sales period, the names of salespersons were placed on slips of paper in a hat. Persons whose names were drawn from the hat were fired on the spot.

It is not surprising that the investors lost heavily. By December of 1977, eleven hundred persons had purchased London commodity options through Lloyd, Carr.[6] Only thirty-three persons, three percent of all investors, made a profit on their investments. Approximately fourteen percent of all investors lost part of their investments. Eighty-three percent of Lloyd, Carr's investors lost everything.

State and federal legal action began in January of 1978. Several of those actions are relevant to this case. After receiving numerous complaints from persons solicited by Lloyd, Carr, the Attorney General of the State of Michigan sought a preliminary injunction in state court. Lloyd, Carr removed the case to federal court and the Commodities Future Trading Commission (CFTC), the federal agency vested with exclusive jurisdiction over trading in commodity futures, intervened as a party plaintiff. On December 5, 1977, Chief Judge Noel Fox of the United States District Court for the Western District of Michigan granted the preliminary injunction, finding that Lloyd, Carr had committed "a number of egregious, inexcusable violations of federal law" and that it was engaged in "inherently fraudulent activity." *Kelley v. Carr*, 442 F.Supp. 346 (W.D.Mich.1977). This order enjoined Lloyd, Carr's fraudulent and deceitful activity, as well as the destruction or disposition of any "business related property."

Judge Fox further ordered compliance with Rule 32.7(e) of the CFTC, requiring production for inspection of records maintained pursuant to federal law. *See* 17 C.F.R. § 32.7(e) (1977).[7]

---

6. Examples of the investment involved in commodity options purchased through Lloyd, Carr are as follows:

| Commodity | Unit of Sale | Option Price |
|-----------|--------------|--------------|
| Sugar | 50 metric tons | $11,000 |
| Coffee | 5 metric tons | 14,000 |
| Copper | 25 metric tons | 5,300 |

7. 17 C.F.R. § 32.7 (1977) required, *inter alia*, the following:

(a) Each person which accepts any money, securities or property (or extends credit in lieu thereof) from an option customer as payment of the purchase price in connection with a commodity option transaction shall keep full, complete and systematic records together with all pertinent data and memoranda of or relating to such transactions. Such records shall at least include all orders (filled, unfilled or cancelled), signature cards, books of records, journals, ledgers, cancelled checks, copies of all statements of purchase, exercise or lapse, and reports, letters, disclosure statements and confirmation statements required by § 32.5 of this Part, solicitation or advertising material (including the texts of standardized oral presentations and of radio, television, seminar or similar mass media

In the meantime, the Securities Division of the Office of the Secretary of State of Massachusetts had initiated its own investigation in response to more than one hundred seventy complaints received from persons solicited by Lloyd, Carr. On December 21, 1977, an employee of the Securities Division observed papers and materials being discarded from Lloyd, Carr's office at 84 State Street in Boston. The abandoned materials were confiscated and subsequently found to include records Lloyd, Carr was required to maintain by both CFTC Rule 32.7(e) and Judge Fox' order. The next morning, John M. Hurley, counsel for the Securities Division, served a subpoena duces tecum for a variety of business records on Lloyd, Carr and many of its employees.

On January 9, 1978, Chief Judge Fox found probable cause to believe that several persons, including defendants Brien, Shuster, and Zolla, who worked at Lloyd, Carr's Boston office, had violated the injunction of December 5 and ordered them to show cause why they should not be held in criminal contempt. *United States v. Carr*, Crim. Cont. No. G78–2 C.A. (W.D.Mich. Jan. 9, 1978).

On January 10, 1978, a Lloyd, Carr investor informed Raymond Cocchi, Director of the Massachusetts Securities Division, that he had called Lloyd, Carr's Boston office and had been told that all account executives had been transferred to Atlanta, Georgia. Later that day, Hurley swore out an affidavit setting forth this and other relevant facts obtained during the Securities Division's investigation of Lloyd, Carr.

On January 11, 1978, Robert Boraks, Special Trial Counsel for the CFTC, swore out an affidavit detailing his knowledge of Lloyd, Carr's operations. Boraks' knowledge was obtained during the CFTC's intervention before Judge Fox, from interviews with Lloyd, Carr clients and employees, and from examination of CFTC files on Lloyd, Carr. The opinion and orders of Judge Fox in *Kelley v. Carr, supra,* and *United States v. Carr, supra,* were appended to Boraks' affidavit, as were several affidavits selected at random from those submitted to Judge Fox in *Kelley v. Carr*. The Boraks and Hurley affidavits were presented to the United States Magistrate as an Affidavit for Search Warrant later that day in Boston. The magistrate authorized a search and seizure of eight categories of Lloyd, Carr's books and records from its office at 84 State Street, Boston, including many of those required by federal law to be maintained. Execution of the warrant by F.B.I. agents resulted in the seizure of most of Lloyd, Carr's books and records and the curtailment of its Boston operations.

## I. *The Search Warrant*

### A. *Appellants' Expectation of Privacy*

Brien, Labus and Zolla contend there was no probable cause for the issuance of the warrant and that it did not meet the particularity requirement of the fourth amendment.[8] The government denies this contention and questions the standing of Brien, Labus and Zolla to challenge the warrant.

■ The district court found that Brien and Zolla "definitely" had standing and that Labus also had standing, although his standing was "borderline." We find no error in this determination.

In *Rakas v. Illinois,* 439 U.S. 128, 140, 99 S.Ct. 421, 429, 58 L.Ed.2d 387 (1978), the Supreme Court reduced the issue of "standing" to one essential question: did the persons asserting a fourth amendment claim have a legitimate expectation of privacy in the areas searched. The concurring opinion of Mr. Justice Powell, also entered into by

---

presentations), circulars, memoranda, publications, writings, and all other literature or written advice distributed to option customers or prospective option customers.

**8.** The fourth amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S.Const., amend IV.

Chief Justice Burger, suggests a variety of factors for consideration in answering this question. Were the persons asserting the claim legitimately on the premises? Did the persons take the customary precautions to protect their privacy? Had the persons used the location in a way which implied a subjective expectation of privacy? Is the asserted expectation of privacy consistent with the historical notions of privacy held by the Framers of the fourth amendment? Did the persons possess conventional property rights in the area searched? *Rakas v. Illinois,* 439 U.S. at 150-53, 99 S.Ct. at 434 435 (Powell, J., concurring).

The district court requested that argument on standing focus on six factors: "(1) his [each defendant's] position in the firm; (2) did he have any ownership interest; (3) his responsibilities; (4) his power to exclude others from the area, if any; (5) did he work in the area; (6) was he present at the time of the search." The district court properly adapted the *Rakas* guidelines to this case.[9]

### B. *Probable Cause*

The search warrant authorized the seizure of the following items:

> Lloyd, Carr's bank statements, cash receipt books, option purchase records, sales material distributed to customers, employee compensation records, customer account records, sales training material and customer lists.

These materials constituted most of the business records of Lloyd, Carr.

Only Zolla fully briefed the search warrant issues on appeal. Buzzi waived the issues entirely, while Labus, Shuster and Brien incorporated Zolla's arguments pursuant to Federal Rule of Appellate Procedure 28(i). Although Zolla's summary of argument challenges the search warrant on the grounds of lack of particular descriptions of the things to be seized as well as lack of probable cause for its issuance, his brief focuses entirely on the alleged lack of probable cause for a warrant authorizing the seizure of all of the papers in each of the categories of business records enumerated in the search warrant.[10]

Appellants are thus taking a position alluded to in *Lafayette Academy,* 610 F.2d 1 at 5 (1st Cir. 1979), to the effect that the warrant clearly describes the items to be seized, but that such a widespread seizure exceeds the underlying probable cause appearing in the affidavit. We agree that the executing officers were sufficiently instructed as to what to take and that this, therefore, is not a case resembling *United States v. Klein,* 565 F.2d 183 (1st Cir. 1977), where the warrant descriptions of what to seize left too much to the discretion of the officers. But we do not agree that the underlying probable cause, as shown in the affidavit, was insufficient to justify seizure of all the materials listed in the warrant. As we explain in this opinion, the fraud was so extensive as to justify a belief by the magistrate that all these documents were likely to constitute evidence of the crimes under investigation. The present situation contrasts sharply with that in *Lafayette* where seizure of *all* records could not have been justified

---

**9.** It also considered other factors relevant to whether there existed a societal expectation of privacy under these circumstances. The district court was aware that, unlike normal business offices, Lloyd, Carr's Boston office was a citadel of security. In part to protect salesmen from angry customers, the door to the sales floor and management offices was locked from the inside. Business records, other than the daily working papers of salesmen, were either locked in file cabinets or kept in separate rooms to which only a few persons, including appellants, had access. The evidence before the district court established that Lloyd, Carr went to great lengths to keep its methods of operation secret.

**10.** One of the appellants contends:

> This appeal is concerned not so much with any danger that the officers executing the warrant seized documents upon the mistaken assumption that they fell within the magistrate's descriptions of the things to be seized. *United States v. Klein,* 565 F.2d 183 (1st Cir. 1977). Rather, the claim here is that the descriptions, though relatively clear are far broader than can be justified by the information set forth in the search warrant application. *Montilla Records of Puerto Rico, Inc. v. Morales,* 575 F.2d 324 (1st Cir. 1978). [Brief of Robert Ralph Zolla at 10.]

even assuming a well-drawn warrant to that effect. The defendant's business in *Lafayette* was apparently legitimate, and as the suspected criminal activity went to only one aspect of it, only certain files, relating to that aspect, could be authorized for seizure.

The question to be decided is: what must be shown to establish probable cause that most or all of the business records of a company are linked to a mail and wire fraud scheme.

As the Supreme Court has emphasized:

In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and·prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

*Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). *See also United States v. Zurosky,* 614 F.2d 779 at 784, n. 2 (1st Cir. 1979).

■ In this case, the affidavit indicated that the government sought the warrant in an effort to prove the existence of "a scheme and artifice to defraud and a scheme to obtain names by false and fraudulent pretenses and promises by the use of the United States mails and through transmission of signs and sounds in interstate commerce, in violation of 18 U.S.C. 1341 and 1343." To prove violations of sections 1341 and 1343 of title 18, the government had to show the existence of "(1) a scheme conceived . . . for the purpose of defrauding . . . by means of false pretenses, representations or promises and (2) use of the United States mails [or interstate wire communications] in furtherance of that scheme." *Gold v. United States,* 350 F.2d 953, 956 (8th Cir. 1965); *see United States v. Cady,* 567 F.2d 771 (8th Cir. 1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978); *United States v. Reid,* 175 U.S.App.D.C. 120, 533 F.2d 1255 (D.C. Cir. 1976); *New England Enterprises, Inc. v. United States,* 400 F.2d 58, 72 (1st Cir.

1968), *cert. denied,* 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969). The essence of a scheme is a plan to deceive persons as to the substantial identity of the things they are to receive in exchange. *Harrison v. United States,* 200 F. 662 (6th Cir. 1912). A pattern of deceptive conduct may show the existence of a plan, scheme or artifice. *See generally United States v. Nance,* 502 F.2d 615, 618 (8th Cir. 1974), *cert. denied,* 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975); *United States v. Seasholtz,* 435 F.2d 4, 8 (10th Cir. 1970). Accordingly, if the magistrate had probable cause to believe that Lloyd, Carr used the mails and interstate wire communications in furtherance of a scheme to defraud, a valid warrant could issue authorizing the seizure of all materials the magistrate had probable cause to believe were evidence of that scheme.

■ We reject Zolla's argument that, at most, the government had probable cause to seize Lloyd, Carr's records pertaining to transactions involving the two hundred fifty persons who complained about Lloyd, Carr to various regulatory authorities. As noted, the mail and wire fraud statutes focus on the scheme, not on the implementation of it. The two hundred fifty complaints were relevant to the probability that other Lloyd, Carr customers were treated similarly, as well as to whether actual fraud was committed upon the complainants. Since a scheme involves "some connotation of planning and pattern," *Fabian v. United States,* 358 F.2d 187, 193 (8th Cir.), *cert. denied,* 385 U.S. 821, 87 S.Ct. 46, 17 L.Ed.2d 58 (1966); *United States v. Ross,* 321 F.2d 61, 68 (2d Cir.), *cert. denied,* 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963), it follows that evidence of planning and pattern may show the existence of a scheme. *See generally United States v. Nance,* 502 F.2d 615. We think it could be fairly inferred from similarities in sales techniques and business practices reported by the two hundred fifty complaints, the information obtained from former Lloyd, Carr employees interviewed by investigators and other information gained by investigators that it was

more likely than not that Lloyd, Carr was using similar, if not identical, fraudulent, deceptive and misleading sales techniques and business practices with most of its customers. The two hundred fifty complaints that surfaced could fairly be inferred to be only the tip of the iceberg.

After reviewing the materials contained in the affidavit, we conclude that the facts presented to the magistrate warranted a strong belief that Lloyd, Carr's operation was, solely and entirely, a scheme to defraud by use of the mails and interstate telephone calls.

The affidavit contained three items of significant probative value: the affidavit of Robert Boraks, Special Trial Counsel to the Commodity Futures Trading Commission; the affidavit of John M. Hurley, attorney for the Securities Division of the Office of Secretary of State of the Commonwealth of Massachusetts; and copies of the orders and supporting opinion of Chief Judge Fox in *Kelley v. Carr,* 442 F.Supp. 346 (N.D.Mich. 1977), and *United States v. Carr,* Crim.Cont. No. G78–2 C.A. (N.D.Mich. January 9, 1978). Borak's affidavit stated that, on the basis of his analysis of the complaints of seventy-five Lloyd, Carr customers, interviews with twenty former Lloyd, Carr employees and his review of CFTC files on Lloyd, Carr, he believed that it was running a "boilershop" sales operation. Boraks, who had been involved in *Kelley v. Carr* and *United States v. Carr,* described Lloyd, Carr's organization, sales techniques and business practices in detail in his affidavit concluding that "[t]he sales program . . . includes patterns of representations which are false, representations which are ambiguous in a way calculated to mislead, representations for which there is no reasonable basis designed to lure the prospect to purchase, and purposeful omissions of material facts." In light of Boraks' familiarity with Lloyd, Carr, the facts he asserted were entitled to great weight in the magistrate's determination that Lloyd, Carr was engaged in a general scheme to defraud.

Boraks also stated that he had seen numerous documents reflecting Lloyd, Carr's operations, including telephone scripts, sales literature, sales quota sheets, confirmations mailed to customers, and lead cards used to provide salesmen with prospects. In addition, Boraks averred that he knew that Lloyd, Carr was required by federal regulation to maintain records of all orders, signature cards, books of record, journals, ledgers, cancelled checks, copies of all statements or tapes of purchase exercises, solicitation or advertising material and circulars, memoranda and writings distributed to option customers. This provided the magistrate with a specific description of the universe of records which might be likely to contain evidence of the scheme to defraud.

Hurley's affidavit stated that his office had investigated Lloyd, Carr because it had received more than one hundred seventy complaints from persons solicited. Hurley's summary of the similarities of those complaints painted a picture of fraud, misrepresentation and deceit nearly identical to that described by Boraks. In addition, Hurley described the physical layout of the Boston office of Lloyd, Carr. Like Boraks, Hurley stated his belief that Lloyd, Carr was using the mails and interstate telephone calls to conduct its business, and stated the facts on which that belief was based. The facts sworn to by Hurley corroborated those sworn to by Boraks and provided substantial justification for the inference that the sales techniques and business practices reported by the complainants were being used with all Lloyd, Carr customers. Most importantly, Hurley's affidavit informed the magistrate that Lloyd, Carr was disposing of records contrary to federal regulation and Judge Fox' order and that there was evidence that Lloyd, Carr was closing down its Boston office.

Judge Fox' orders and opinions added great weight to the affidavit. The opinion in *Kelley v. Carr* corroborated the existence of a scheme to defraud implemented by the mails and telephone. The contempt order emphasized the lawlessness of the operation, particularly that portion conducted from the Boston office.

We also conclude from our review of the affidavit facts that they warranted a finding of probable cause that the material, books and records enumerated in the search warrant were evidence of or contained evidence of the existence of a scheme to defraud at Lloyd, Carr's Boston office. The affidavit described in detail the records Lloyd, Carr maintained voluntarily and in response to federal regulation and Judge Fox' order. The descriptions of Lloyd, Carr's sales techniques and business practices permitted a relatively accurate determination of what records would be relevant to mail and wire fraud. The bank statements and cash receipt books would show the amounts of salesmen's commissions, whether option monies actually were segregated and whether customers actually were receiving their money back. Sales materials probably would contain evidence of representations made to customers through the mails. The option purchase journal would reveal names of customers and the details of their purchases. Employee compensation records were relevant to representations made to customers concerning commissions and to the problem of defining management responsibilities. The customer lists and customer account records were relevant to determination of customer profits and losses in the market and, therefore, bore on the truthfulness of Lloyd, Carr's representations concerning customer profits. The sales training materials were relevant to the determination of whether the sales techniques complained of were aberrations or the general practice.[11]

■ We hold that where there is probable cause to find that there exists a pervasive scheme to defraud, all the business records of an enterprise may be seized, if they are, as here, accurately described so that the executing officers have no need to exercise their own judgment as to what should be seized.

## II. *Preemption and Implied Repeal*

We deal next with the contention that appellants' convictions should be set aside because the general mail and wire fraud statutes under which the convictions were obtained were either preempted or impliedly repealed by the enactment of the more specific antifraud provisions of the Commodities Futures Trading Act.[12]

Appellants' argument rests primarily on the exclusive jurisdiction provisions of Section 2(a)(1) of the CFTA:

> *Provided,* That the Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty" or "decline guaranty"), and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 7 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title[.]

7 U.S.C. § 2 (1978).

They also point to supporting language in the Conference Report on the 1974 Amend-

---

11. This was not a case in which the suspected crime may have been reflected in a segregable class of records. *Cf. In re Lafayette Academy,* 610 F.2d 1 (1st Cir. 1979) (Federal Insured Student Loan Program-related records); *VonderAHE v. Howland,* 508 F.2d 364 (9th Cir. 1974) (yellow sheets and green cards maintained by dentist as records for patients whose payments were not reported as income to the IRS). Rather, the affidavit showed that Lloyd, Carr was engaged in the very specialized business of selling London commodity options and that its entire operation was a scheme to defraud investors.

12. Fraud in the sale of trading of commodities futures is prohibited by 7 U.S.C. § 6*o*:

> (1) It shall be unlawful for any commodity trading advisor or commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
>
> (A) to employ any devise, scheme, or artifice to defraud any client or participant or prospective client or participant; or
>
> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

ments to the CFTA. *See* H.Conf.Rep.No. 93–1383, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, p. 5843.

Although we agree that Congress intended the CFTC to occupy the entire field of commodities futures regulation, we see two reasons why that conclusion is of little help to appellants.

■ Assuming, *arguendo,* that appellants' acts violated both 7 U.S.C. § 6o and 18 U.S.C. §§ 1341 or 1343,[13] we find no basis for a conclusion that the former either preempted or impliedly repealed the latter. It was the fraudulent scheme furthered by use of the mails and interstate telephone calls that brought appellants within the purview of the mail and wire fraud statutes and not the sale of commodity options. While courts have held that the CFTA preempts state regulation of commodities futures, *Clayton Brokerage Co. of St. Louis, Inc. v. Mouer,* 520 S.W.2d 802 (Tex.Civ.App.1975), it has also been held that the CFTA does not preempt state general antifraud statutes. *People of New York v. Monex Int'l, Ltd.,* 86 Misc.2d 320, 380 N.Y.S.2d 504 (1976). By the same analysis, since 18 U.S.C. §§ 1341 and 1343 are federal general antifraud statutes, they cannot be preempted by the CFTA.

■ Moreover, in urging a finding of implied repeal, appellants march into the teeth of a strong judicial policy disfavoring the implied repeal of statutes. *See United States v. Borden,* 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939). For a court to find implied repeal, there must be a positive repugnancy between the two statutes. *Posados v. National City Bank,* 296 U.S. 497, 504, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936);

*Wood v. United States,* 41 U.S. (16 Peters) 341, 362–63, 10 L.Ed. 987 (1842). Where two statutes cover the same subject, effect will be given to both, if possible. *Posados v. United States, supra.* Partial repeals will not be implied because they do not satisfy the requirement that the intent of the legislative body be clear and unequivocal. *Id.* It is also generally held that for a later-enacted statute to impliedly repeal an earlier one, the later statute must cover the entire field occupied by the earlier one. *United States v. Tynen,* 78 U.S. (11 Wall.) 88, 20 L.Ed. 153 (1870); *United States v. Montgomery,* 21 F.Supp. 770, 771 (D.N.M. 1938). The CFTA, which prohibits only interstate communications in commodities fraud, obviously does not cover the entire ground occupied by 18 U.S.C. §§ 1341 and 1343, which apply to mail or interstate wire communications in furtherance of *any* scheme to defraud. There can be no finding of implied repeal in these circumstances. *Cf. Edwards v. United States,* 312 U.S. 473, 484, 61 S.Ct. 669, 675, 85 L.Ed. 957 (1941) (the Securities Act does not operate as an implied repeal of the mail fraud statutes); *Smith v. Groover,* 468 F.Supp. 105 (N.D.Ill. 1979) (CFTA does not impliedly repeal the federal antitrust laws); *R. J. Hereley & Son Co. v. Stotler & Co.,* 466 F.Supp. 345 (N.D.Ill.1979) (congressional grant of exclusive jurisdiction to the CFTC was not intended to eliminate existing private remedies).

■ Although the statutes prohibit similar conduct, they operate independently and harmoniously. The government's election to prosecute appellants under the statute which, at the time, provided the more severe penalty,[14] was an exercise of discretion

**13.** The district court found, *inter alia,* that the actions of appellants did "not appear to constitute violations of 7 U.S.C. § 13b" because the government never alleged that appellants "mailed or wired reports containing misleading crop or market information or conditions affecting commodity prices" as prohibited by section 13b. The district court failed, however, to consider whether the acts violated 7 U.S.C. § 6 o, the more pertinent provision of the CFTA. *See* note 12, supra. In light of our other con-

clusions in regard to the issues of preemption and implied repeal, we find this to be harmless error. Fed.R.Crim.P. 52(a).

**14.** At the time of appellants' indictment, Section 13(c) of the CFTA made violation of Section 6o of the CFTA punishable by a fine of up to $100,000 and/or imprisonment of not more than one year. The general mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, respectively, provide a punishment of a fine or not more than $1,000 or imprisonment of not

that violated no rights of appellants. *United States v. Batchelder*, 442 U.S. 114, 123, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979).

### III. *The Jury Instructions*

■ Appellants Buzzi and Zolla challenge several aspects of the district court's instructions to the jury.

Zolla challenges the district court's inclusion in the jury instruction of two allegedly conflicting definitions of the term "scheme or artifice" as that term is used in 18 U.S.C. §§ 1341 and 1343. At one point in the instructions, the district court articulated this partial definition:

> The scheme need not be fraudulent upon its face, and need not misrepresent any fact, because all that is necessary is that it be a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension, and that the mail service of the United States be used in the execution of the scheme.

Later in the charge, the court used a more expansive definition:

> It is immaterial whether only the most gullible would have been deceived by the techniques involved. Section 1341 protects the naive as well as the worldly-wise, and the former are more in need of protection than the latter.

In response to Zolla's timely objection, the court stated, "I don't believe they are inconsistent."

Zolla acknowledges that several circuits have adopted the "most gullible" instruction, *see, e. g., Lemon v. United States*, 278 F.2d 369, 373 (9th Cir. 1960); *United States v. Sylvanus*, 192 F.2d 96, 105 (7th Cir. 1951), *cert. denied*, 342 U.S. 943, 72 S.Ct. 555, 96 L.Ed. 701 (1952); *Bogy v. United States*, 96 F.2d 734, 741 (6th Cir.), *cert. denied*, 305 U.S. 608, 59 S.Ct. 68, 83 L.Ed. 387 (1938), but argues that the more prevalent and correct standard is the "ordinary prudence and comprehension" standard, *see, e. g., United States v. Netterville*, 553 F.2d 903 (5th Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 189, 54 L.Ed.2d 135 (1977); *United States v. Beitscher*, 467 F.2d 269 (10th Cir. 1972); *United States v. Seasholtz*, 435 F.2d 4 (10th Cir. 1970). We disagree. If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts. The only issue is whether there is a plan, scheme or artifice intended to defraud. We discern no intention on the part of Congress to differentiate between schemes that will ensnare the ordinary prudent investor and those that attract only those with lesser mental acuity. The inconsistency, if any, in the instruction could only have helped the appellants, and it is, therefore, harmless error. Fed.R.Crim.P. 52(a).

■ Zolla and Buzzi challenge the failure of the district court to instruct the jury that mailings which alert the victim to the existence of improprieties cannot form the basis of a mail fraud conviction. We note first that there was no evidence that the mailings sent by appellants were intended to inform the recipients of improprieties. *See New England Enterprises, Inc. v. United States*, 400 F.2d 58, 71 (1st Cir. 1968), *cert. denied*, 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969). However, even if this obstacle were overcome, the record shows that the district court gave a form of the requested instructions:

> If you find that the particular mailing was not sent with the intent to carry out an essential step in a scheme to do fraud, then you must reach a not guilty verdict as to that mailing. . . . In order to reach a guilty verdict as to any particular mailing alleged in the indictment, you must find beyond a reasonable doubt that

more than five years. The federal conspiracy statute carries a maximum penalty of a fine of no more than $10,000 and/or imprisonment of not more than five years. 18 U.S.C. § 371. In 1978, Congress increased conviction for mail and wire fraud in connection with commodities trading to a felony punishable by a fine of not more than $500,000 and/or imprisonment of not more than five years, together with the costs of prosecution. *See* The Futures Trading Act of 1978, Pub.L. 95–405.

the mailed article in question was sent with the intent to carry out an essential step in the alleged scheme to defraud. As a whole, the charge fairly and accurately stated the law, and must be upheld. *See Johnson v. Rederi*, 613 F.2d 334, 350 (1st Cir. 1980).

▆▆▆ Buzzi further contends it was error for the district court to instruct the jury that conscious avoidance of knowledge of whether one's statements are false and misleading is knowing action. He argues that the mail fraud statute requires a finding of specific intent to deceive to sustain a conviction, and that the district court's instruction allowed him to be found guilty under a less stringent standard. We find no error in the use of a "conscious avoidance" instruction in concert with a specific intent instruction. Since we equate the term "conscious avoidance" with a specific intent to avoid knowing whether one's statements are false and misleading, conscious avoidance is merely a subset of specific intent. This is a more stringent standard than the "wilful recklessness" standard proposed by Buzzi in his brief, which might also be characterized as conscious carelessness. The "conscious avoidance" standard implies a specific intent to avoid the proscription of the law by not determining the accuracy of one's statements. If, by such conduct one participates in a scheme to defraud, that person is as guilty of violating the mail fraud statutes as a person who is conscious of the nature of his statements. *See generally United States v. Hanlon*, 548 F.2d 1096, 1101 (2d Cir. 1977); *United States v. Natel-*

*li*, 527 F.2d 311, 322 (2d Cir. 1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976); *Bentel v. United States*, 13 F.2d 327 (2d Cir.), *cert. denied sub nom. Amos v. United States*, 273 U.S. 713, 47 S.Ct. 109, 71 L.Ed. 854 (1926).

## IV. *The Count Thirty-Two Variance*

▆▆▆ Buzzi also alleges his conviction on Count Thirty-Two was improper because it alleged the mailing of a sugar option while the proof at trial pertained to a copper option. We find little merit in Buzzi's argument. Although the indictment did pertain to a sugar option, Buzzi was provided with copies of testimony and evidence presented to the grand jury, including receipts and the option purchase journal, which showed the details of the purchase. Despite this information, Buzzi failed to inform the district court of the defect in the indictment prior to trial, as required by Fed.R.Crim.P. 12(b)(2).[15] We may grant relief from this failure by Buzzi, Fed.R. Crim.P. 12(f),[16] but not unless we find that substantial rights are affected. Fed.R. Crim.P. 52(b).[17] The test of substantiality is provided by *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935):

The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered

---

**15.** Fed.R.Crim.P. 12(b) provides:

(b) *Pretrial Motions.* Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:

. . . . .

(2) Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings)[.]

**16.** Fed.R.Crim.P. 12(f) provides:

(f) *Effect of Failure to Raise Defenses or Objections.* Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court pursuant to subdivision (c), or prior to any extention thereof made by the court, shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

**17.** Fed.R.Crim.P. 52(b) provides:

(b) *Plain Error.* Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

at the trial; and (2) that he may be protected against another prosecution for the same offense.

There can be no question that Buzzi was aware of the charges against him. The only possible cause for confusion was the incorrect name given to the option Buzzi sold to Cappozzi; all other facts of the sale were correct. There is no allegation that Buzzi was uncertain as to the sale for which he was being prosecuted. Moreover, we find no possibility that the variance could have subjected Buzzi to double jeopardy. The variance was not fatal. *See United States v. Quicksey*, 525 F.2d 337, 341 (4th Cir. 1975), *cert. denied*, 431 U.S. 931, 97 S.Ct. 2637, 53 L.Ed.2d 247 (1976).

## V. *Prejudicial Preindictment Publicity*

Buzzi's final challenge focuses on the allegedly prejudicial effect on the grand jury of publicity concerning Lloyd, Carr in the Boston area. Buzzi argues that the publication of derogatory information about Lloyd, Carr prior to and during the grand jury's deliberations was so pervasive that the district court erred in denying his motion to dismiss the indictment.

It is true that the sensational activities of Lloyd, Carr precipitated extensive critical comment in the press in New England and the Eastern seaboard. Because of the possible effect of that publicity on the defendants' right to a fair trial, venue was transferred to Springfield, Massachusetts, and the trial of Alan Abrahams, a/k/a James Carr, the President of Lloyd, Carr, was severed from appellants' and transferred to Arizona. In effect, Buzzi contends that publicity so intense as to require a change of venue must have prejudiced the grand jury.

The rule in this circuit is that an indictment will not be dismissed on the grounds of prejudicial preindictment publicity unless it can be shown that the jury failed in its sworn duty to act with impartiality. *Gorin v. United States*, 313 F.2d 641, 645 (1st Cir. 1963), *cert. denied*, 379 U.S. 971, 85 S.Ct. 669, 13 L.Ed.2d 563 (1965). *Gorin* was decided prior to the adoption of the "inherently prejudicial" standard of *Sheppard v. Maxwell*, 384 U.S. 333, 352–55, 86 S.Ct. 1507, 1516–1518, 16 L.Ed.2d 600 (1966). *Sheppard* establishes that, in some circumstances, publicity concerning a case may be so extensive and intense that no inquiry need be made as to the actual effect of the publicity on the petit jury. Prejudice is assumed; it need not be established. If prejudice is assumed as to petit juries, it may also be assumed as to grand juries. However, it does not follow that the remedy for possible exposure to inherently prejudicial publicity should be the same for grand juries as for petit juries. The different treatment of grand and petit juries which may have been exposed to inherently prejudicial publicity is premised, of course, on the theory that the taint of a grand jury will be purged by the deliberations of an untainted petit jury. As noted in *Silverthorne v. United States*, 400 F.2d 627, 634 (9th Cir. 1968), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971),

> the grand jury deliberates and indicts, as an accusing body, on the standard of "reasonable probability" that a crime has been committed by some person. It is not a trial body. *United States v. Atlantic Comm'n Co.*, 45 F.Supp. 187, 192 (E.D.N.C.1942). The quantum of evidence necessary to indict is not as great as that necessary to convict. If a grand jury is prejudiced by outside sources when in fact there is insufficient evidence to indict, the greatest safeguard to the liberty of the accused is the petit jury and the rules governing its determination of a defendant's guilt or innocence. And, if impartiality among the petit jurors is wanting, the cure is reversal by the appellate courts.

Since there is no contention here of a publicity prejudiced petit jury, we need proceed no further.

*Affirmed.*