UNITED STATES, Appellant,

v.

Paul FALON, a/k/a Peter Maitra,
a/k/a Pradeep Kumar Maitra,
Defendant, Appellee.

No. 91–2120.

United States Court of Appeals,
First Circuit.

Heard Feb. 6, 1992.

Decided March 25, 1992.

Margaret R. Hinkle, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief for appellant.

Daniel D. Gallagher with whom Kathryn S. Ragan, Boston, Mass., was on brief for defendant, appellee.

Before TORRUELLA, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

COFFIN, Senior Circuit Judge.

This is a government appeal, under 18 U.S.C. § 3731, from the district court's actions in granting defendant's motion to suppress and in denying the government's motion for reconsideration. At issue in this prosecution for mail fraud (18 U.S.C. § 1341), using a false name in furtherance of mail fraud (18 U.S.C. § 1342), inducing interstate transportation for fraud (18 U.S.C. § 2314), and fraudulent use of a Social Security number (42 U.S.C. § 408(g)(2)), are some six boxes of records seized from defendant's apartment pursuant to a warrant. After a non-evidentiary hearing and several rounds of briefing, the district court held the warrant to be insufficiently particular. It subsequently denied a motion for reconsideration in which the government belatedly raised the defense of good faith to the motion to suppress. We have concluded that the warrant was sufficiently particular with respect to several categories of records. We therefore hold that those records may be admitted into evidence and that all other items must be suppressed.

## The Affidavit

The affidavit on which the search warrant was based was a fourteen page document subscribed to by FBI Special Agent Carazza, who had conducted a nine month investigation of an "advance fee scheme" involving defendant "doing business as Or-ion Capital Group (Orion) and Trinity Holdings Limited (Trinity Holdings)." He had been assisted by Special Agent Egan, who had spent most of his ten years with the FBI in investigating and prosecuting financial crimes and fraudulent schemes. The following information is contained in the affidavit.

*The scheme.* An advance fee scheme was defined as a scheme in which an individual solicits potential borrowers seeking large loans from non-conventional sources, charges a fee in advance, and thereafter misleads the borrowers into thinking that the loans are in the process of being funded. In defendant's case, the scheme was averred by Agent Carazza to have worked as follows:

> My nine month investigation has revealed that although the scheme varies from borrower to borrower, Falon usually tells the victims that Orion has millions of dollars to lend. Falon then requires the victims to pay an advance fee. After receiving an initial fee, Falon tells the victims he will arrange financing rather than provide it. Falon also tells the victims that they are assured of financing, but that his fee for arranging the financing is one percent of the loan. Falon then issues a commitment letter to the victims and requires the one percent fee be paid when the commitment letter is signed, which is prior to receiving the loan. Falon then promises the victim a closing date within a couple of weeks.

To the agent's knowledge no loans were ever made by or through the efforts of defendant, Orion, or Trinity Holdings.

*The victims.* The affidavit identified five victims who, between December 1989 and October 1990, had paid defendant some $91,750. Named in the affidavit were the following individuals, the first three of whom had been referred to defendant by Jain, a mortgage broker in Rhode Island:

> Krah, who sought a loan of from $5,000,-000 to $8,000,000 for an apartment complex, and made three payments, totalling $57,250.

Todd, who sought a loan of $3,000,000 to refinance a self-service storage business, and made one payment of $2,500.

Donabedian, who sought a loan of $7,000,000 to build a golf course, and made one payment of $2,500.

Grillo, who sought a loan of $25,000,000 to fund a hotel project, and made two payments totalling $17,000.

Shyamalan, who sought a loan of $1,200,-000 for his business, and made one payment of $12,500.

From a review of bank records of defendant, Orion, and Trinity Holdings, Agent Carazza estimated that, between October 1989 and January 1991, there were 25 other potential victims of the scheme and that the total "advance fees" collected exceeded $275,000. He also discovered no evidence of any return of payments or any depositing in escrow of any payments.

*The participants.* Defendant, in registering a motor vehicle, had used a fabricated Social Security number. Orion's telephone number, as it appeared in a Wall Street Journal advertisement, was the same number used by defendant in his apartment. Contrary to defendant's representations, Orion was not listed on the Zurich stock exchange, nor were Krah's advance fee payments of $57,250 held in escrow in Orion's account at Shawmut Bank. Orion's account at Shawmut had a balance at the time of $152. Moreover, there was no other account then maintained by Orion, Trinity Holdings or defendant. Trinity Holdings was averred to be a name occasionally used by Orion.

*The premises.* The affidavit described two adjoining suites, numbers 602 and 603, each consisting of two bedrooms, a living room and kitchen, in a luxury apartment building at 125 Coolidge Avenue in Watertown, Massachusetts. Victim Krah had visited the suites and reported that defendant "keeps his business records throughout the suites....[and] has a facsimile machine in the kitchen of Suite 603." Defendant had rented the premises on October 30, 1989. This date coincides with the first records of the scheme reviewed by Agent Carazza and the placing of the Wall Street Journal ad about Orion. A Watertown police officer had visited the apartments and had observed "beautiful leather furniture" and defendant's "enormous wardrobe consisting mainly of Italian suits and clothing." Agent Carazza concluded, from a review of bank records, that the furniture and clothing had been purchased from the advance fees received by defendant.

### The Warrant

The search warrant, without specifically incorporating or attaching the affidavit, authorized the search of Suites 602 and 603 and the seizure of items listed in an attachment labeled Schedule A, which read as follows:

The following documents, records and other tangible objects for the period from October 1, 1989 to the present [January 7, 1991] relating to Paul Falon, Orion Capital Group and/or Trinity Holdings Limited:

1. Borrowers' files;
2. Lists of borrowers;
3. Banking and financial records;
4. Financial statements;
5. Advertising records;
6. Checkbooks;
7. Cancelled checks;
8. Telephone records;
9. Address indexes;
10. Message slips;
11. Correspondence, memoranda and documents relating to loans, loan guarantees, potential loans and potential loan guarantees;
12. Mail, telex and facsimile records;
13. Sales literature and brochures;
14. Calendars and diaries;
15. Memory typewriters;
16. Word processors;
17. Computer discs, both hard and floppy; and
18. Other electronic media devices, electronic storage media and related software.

### The Decision Below

The district court, after a non-evidentiary hearing and the submission of memoranda,

held the warrant to be insufficiently particular and granted defendant's motion to suppress. It first noted the absence of any reference in the warrant to the criminal offenses for which the evidence was sought. The court appropriately invoked our decision in *Application of Lafayette Academy*, 610 F.2d 1, 3 (1st Cir.1979), where we pointed out that, in a case where "general rummaging" would seem to be authorized by a warrant, it is necessary to set forth "the precise nature of the fraud and conspiracy offenses ... in order to delimit the broad categories of documentary material and thus to meet the particularity requirement of the fourth amendment."

The court then addressed the government's argument that the affidavit supporting the search warrant, which was both possessed and reviewed by each officer involved in the search, made adequate references to the offenses and thus supplied any defect of particularity in the warrant. It very properly noted that the affidavit, contrary to our holding in *United States v. Klein*, 565 F.2d 183, 186 n. 3 (1st Cir.1977), repeated in *Lafayette*, 610 F.2d at 4, did not use "suitable words of reference which incorporate the affidavit." The government's attempt to argue that *Klein* did not say that an unincorporated affidavit may never come to the rescue of an overgeneral warrant simply indicates that it does not recognize a negative pregnant when it sees one.

The government, however, advanced another argument, indeed, its principal one, to show why the warrant was sufficiently particular. This was that the defendant's enterprise was similar to the high pressure "boiler room" telephone securities sales operation of Lloyd, Carr & Company in *United States v. Brien*, 617 F.2d 299, 309 (1st Cir.1980), as to which we said:

> We hold that where there is probable cause to find that there exists a pervasive scheme to defraud, all the business records of an enterprise may be seized, if they are, as here, accurately described so that the executing officers have no need to exercise their own judgment as to what should be seized.

At one point in the course of the hearing the court seemed to have resolved this issue favorably to the government, saying, after finding no suggestion in the record of any other business being carried on:

> Here I think it's not simply a conclusion, but a finding that I'm making that on the evidence before me this case is quite distinct from a case involving primarily an ongoing legitimate business but along with it some allegedly illegal operation.... This instead is a circumstance in which one may have found there was probable cause for a finding that the primary business operation that was going on in this home and office combination was the very business that was being alleged here to be a violation of federal law.

Appendix at 125.

Ultimately the court changed its mind and rejected the "pervasive fraud" argument for two reasons. First, it reasoned that "[t]he government has proffered some evidence to support a finding that defendant made use of [Orion Capital Group and Trinity Holdings] to further his alleged advance fee scheme, but it has utterly failed to demonstrate that participating in such fraudulent practices is virtually the only activity that the entities engage in." Second, it reasoned that *Brien* applies only to organizations, for "it would require extraordinary proof, if indeed it is not impossible to show, that *every* aspect of an individual's life was geared toward the commission of fraud" and in any event the government had failed to show "that defendant's life was pervaded with fraud within the meaning of *Brien.*"

### Discussion

The question of the proper standard of review to apply in this appeal gives us some pause. As we recently have said in *United States v. McLaughlin*, 957 F.2d 12, 17 (1st Cir.1992), "the findings of the district court after a hearing on a pretrial motion to suppress are binding on appeal unless they are clearly erroneous." Here, however, the hearing was non-evidentiary

and the critical decisions of the court primarily were conclusions of law and only secondarily factual findings derived from the record. That is, the court's conclusion that it was incumbent on the government to prove pervasive fraud in all of Orion's and Trinity Holdings' activities and in defendant's entire life was a legal one; the corollaries that such proof had not been forthcoming were factual but clearly subsidiary. Under these circumstances we suspect that *de novo* review is appropriate. *See United States v. McClintock*, 748 F.2d 1278, 1282 (9th Cir.1984). But to the extent that conclusions in the nature of fact findings are present, we reach the same result as if we held ourselves to determining whether we are "left with the definite and firm conviction that a mistake has been committed," *McLaughlin*, at 17 (quoting *Fortin v. Com'r of Mass. Dept. of Public Welfare*, 692 F.2d 790, 794 (1st Cir.1982) (quoting *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948))).

■ The basic allegations of a fraudulent scheme in Agent Carazza's affidavit are that defendant was "doing business as" Orion Capital Group and Trinity Holdings Limited in Suites 602 and 603, 125 Coolidge Avenue in Watertown, Massachusetts, from October 1989 to the date of the warrant application, January 7, 1991; that defendant maintains records of "his businesses" in those premises; that Orion's advertised telephone number was the same as defendant's; that Trinity Holdings was a name sometimes used by Orion; and that as of October 22, 1990 a bank account at Shawmut Bank in the amount of $152 in the name of Orion was the only account attributable to Orion, Trinity Holdings or defendant.

■ We are, of course, to interpret affidavits for search warrants "in a common-sense and realistic fashion." *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). And, as we said in *United States v. Hershenow*, 680 F.2d 847, 852 (1st Cir.1982), "the magistrate is entitled to go beyond the averred facts and draw upon common sense in making reasonable inferences from those facts."

Reading the affidavit with these precepts in mind, we think it clear that what was described was a fraudulent scheme operated from two adjoining suites by defendant and two largely if not completely phantom entities. No other locus of business was intimated, nor any other facet of operation suggested, for Orion and Trinity Holdings. As we discuss below, we see no significant distinction between this scenario and that present in other "all records/pervasive fraud" cases.

. We begin with our own decision in *Brien*. Although the dimensions of the fraud in that case unquestionably far surpassed defendant's relatively small operation here, our conclusion of pervasiveness was derived in similar fashion from the fact that the warrant affidavit showed repeated episodes of fraudulent conduct and no indications of legitimate business. Moreover, the warrant in *Brien* targeted only the Boston headquarters of Lloyd, Carr & Company, a commodity options brokerage with several offices. It seems clear that, even if there had been a showing that other branches of the company conducted legitimate business, the search and seizure in Boston would have been validated because of the pervasiveness of fraud in that particular location. Falon's activities outside the two suites is therefore of little import if pervasiveness of fraud there makes it likely that the itemized records were linked to the charged mail and wire fraud scheme.

We find implicit support in subsequent caselaw. In *United States v. Kail*, 804 F.2d 441, 444–45 (8th Cir.1986), a warrant authorizing the seizure of almost all of the records of Coin & Stamp Gallery was upheld on the basis of an affidavit describing a pervasively fraudulent operation on the premises. There was no suggestion of any showing that there were no other non-fraudulent operations of the Gallery. Similarly, in *McClintock*, 748 F.2d at 1282–83, an affidavit alleging that defendant engaged in a fraudulent scheme to sell overvalued gemstones through a company trad-

ing on the famous DeBeers name was held to support a search of all gemstones and records on the premises of the company, without any inquiry into possible additional company operations. To the same effect are the decisions in *United States v. Offices Known as 50 State Distributing Co.*, 708 F.2d 1371, 1374–75 (9th Cir.1983) and *National City Trading Corp. v. United States*, 635 F.2d 1020, 1026 (2d Cir.1980). We therefore conclude that the affidavit in this case alleged a fraudulent scheme so pervading the premises of the two suites at 125 Coolidge Avenue as to justify the seizure of all business records found there.

■ This brings us to the district court's holding that the *Brien* principle does not extend to individuals. We note preliminarily that it would be an odd quirk in the law if, by doing fraudulent business as an individual rather than as a corporation or company, one could ensure his premises against an "all records" search. We therefore reject the district court's suggestion that the *Brien* holding applies only to "organizational entities."

■ On the other hand, when an individual's allegedly fraudulent business activities are centered in his home—as apparently was the case here—the "all records" doctrine must be applied with caution. As the district court noted, it would require extraordinary proof to demonstrate that an individual's entire life is consumed by fraud and that *all* records found in the home were subject to seizure. Without such unusual proof, the broad categories of items that may be seized pursuant to an "all records" search of a home must be sufficiently linked to the alleged criminal activity so as to distinguish them from innocent, personal materials.

This is the principle applied in *United States v. Timpani*, 665 F.2d 1 (1st Cir. 1981), where we upheld an "all records" search for loansharking and gambling evidence in an individual's home. The search warrant in *Timpani* allowed seizure of

"... any and all records relating to extortionate credit transactions (loansharking), including lists of loan customers, loan accounts, telephone numbers, address books, lists of criminal associates, records of income, bank statements, records of deposits, cash and checks which are evidence of violations of 18 U.S.C. Sections 892, 893, 894, and 371, gambling paraphernalia and gambling records including lists of bettors, telephone numbers, line sheets, address books, bet slips, tally sheets, bottom sheets, accounts, bank statements, deposits, cash and checks which are evidence of violations of 18 U.S.C. Sections 1084, 1952, 1955 and 371.

*Id.* at 4–5. In rejecting the defendant's claim that the search warrant was insufficiently specific, we noted that each category of items was "plausibly related to the crime—loansharking or gambling—that is specifically set out [in the warrant]." *Id.* at 5. Thus, the authorized search of the defendant's home was restricted to the equivalent of his "business" records, such limitation expressed either by the description of the particular items (e.g., lists of loan customers, loan accounts and bet slips) or by explicitly linking the items to the charged crimes (e.g., bank statements, cash and checks "which are evidence of" the enumerated crimes).

■ Applying that principle here produces a mixed result. Certain of the categories listed in Schedule A describe items unquestionably linked directly and solely to the alleged fraudulent scheme. The most obvious of these are the categories covering borrower's files (# 1), lists of borrowers (# 2), and correspondence, memoranda and documents "relating to loans, loan guarantees, potential loans and potential loan guarantees" (# 11). *See supra* at 1145. Other categories, however, describe items that are no more likely to be related to defendant's fraudulent business than to his personal matters. These include checkbooks (# 6), cancelled checks (# 7), telephone records (# 8), calendars and diaries (# 14), and word processors (# 16). *Id.* Because the warrant failed explicitly to limit these latter categories of items to the subset directly linked to the alleged fraud, the warrant was to that extent insufficient-

ly particular to meet the requirements of the Fourth Amendment.

■ The remedy in the case of a seizure that casts its net too broadly is, as we held in *United States v. Riggs*, 690 F.2d 298, 300 (1st Cir.1982), not blanket suppression but partial suppression. *See also United States v. Diaz*, 841 F.2d 1, 4 (1st Cir.1988); *United States v. Gomez–Soto*, 723 F.2d 649, 654 (9th Cir.1984); *Offices Known as 50 State Distributing Co.*, 708 F.2d at 1375–76; *National City Trading Corp.*, 635 F.2d at 1026.

In this case we are aided by the parties in the task of identifying which documents must be suppressed. Defendant, in his second memorandum of law in support of his suppression motion, listed the categories from Schedule A that were insufficiently particular in that they failed to "distinguish [his] personal papers and belongings ... from the business documents that may constitute evidence of the crimes for which the warrant issued." *See* Memorandum at 4. He asserted that the following categories of documents must be suppressed: (# 6) checkbooks; (# 7) cancelled checks; (# 8) telephone records; (# 9) address indexes; (# 10) message slips; (# 12) mail, telex and facsimile records; (# 14) calendars and diaries; (# 15) memory typewriters; (# 16) word processors; (# 17) computer discs, both hard and floppy; and (# 18) other electronic media devices, electronic storage media and related software.

The government, in its brief and argument on appeal, argues that if the warrant is insufficiently particular as to some items, the following, "at a minimum," pass constitutional muster: (# 1) borrowers' files; (# 2) lists of borrowers; (# 3) banking and financial records; (# 4) financial statements; (# 5) advertising records; (# 11) correspondence, memoranda and documents relating to loans, loan guarantees, potential loans and potential loan guaran-

tees; and (# 13) sales literature and brochures.

Neither list overlaps the other. We adopt this division of categories as drawn by the parties and, accordingly, affirm the district court insofar as it ordered the documents described in defendant's list to be suppressed. We reverse its suppression order, however, with respect to the items contained in the government's list.[1]

*Affirmed in part, reversed in part and remanded for proceedings consistent with this opinion. No costs.*

---

**1.** It is our understanding that the government has no significant interest in the documents that we conclude must be suppressed, and we therefore decline to delve into the issue of the executing officers' "good faith." Hence, we leave undisturbed the district court's ruling that the government failed to show good cause for its untimely assertion of that defense.